42

ROBERT D. McCAFFREY, Plaintiff, v. ILLINOIS CENTRAL GULF RAILROAD COMPANY, Defendant and Third-Party Plaintiff-Appellee.— (OUTBOARD MARINE CORPORATION, Third-Party Defendant-Appellant.)

Fifth District    No. 77-370

Opinion filed April 9, 1979.—Rehearing denied May 11, 1979.

Brady, Donovan & Hatch, of Belleville, and Jacobs, Williams and Montgomery, Ltd., of Chicago (Barry L. Kroll, John D. Daniels, and David A. Novoselsky, of counsel), for appellant.

Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville (Richard E. Boyle, of counsel), for appellee.

Mr. PRESIDING JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Third-party defendant, Outboard Marine Corporation, appeals from a judgment of the circuit court of Madison County entered upon a jury verdict finding it liable to third-party plaintiff Illinois Central Gulf Railroad Company. The jury returned a verdict finding for the plaintiff, Robert McCaffrey, against his employer, defendant railroad, on an F.E.L.A. (Federal Employers' Liability Act, 45 U.S.C. §51 *et seq.* (1970)) count and assessed damages at $1.5 million. It further found third-party defendant liable to third-party plaintiff under a theory of indemnity based upon strict liability in tort. Plaintiff and his employer subsequently entered into a compromise settlement, and the railroad's appeal was dismissed.

The accident giving rise to plaintiff's cause of action occurred on July 15, 1972, while plaintiff was riding a three-wheeled Cushman scooter manufactured by Outboard Marine Corporation, hereinafter referred to as OMC, and furnished him by his employer, Illinois Central Gulf Railroad, hereinafter referred to as the railroad. Plaintiff, a machine inspector, testified that as he was traveling across the railroad facility at McComb, Mississippi, in the course of his duties, he heard a "whoof" sound and noticed a flame on his left trouser leg. While attempting to extinguish the flame with his left hand, he slid to the right of the seat whereupon the vehicle overturned, pinning him beneath. At that moment gasoline poured from the filler spout, ignited and spread over his body. There were no other witnesses to the accident. Plaintiff's brother and a co-worker, Robert Carroll, responded to plaintiff's cries for help and were able to extinguish the flames within one or two minutes. As a result of the accident plaintiff suffered second- and third-degree burns over 60% of his body.

On December 18, 1974, plaintiff instituted suit against the railroad pursuant to the Federal Employers' Liability Act. In his complaint he alleged that his employer had been negligent in failing to provide him with a safe place to work, in failing to provide equipment in proper working order, in failing to inspect the equipment, in failing to warn of the equipment's faulty condition, in failing to maintain the equipment in proper working order and in failing to adopt equipment upkeep and repair practices. On August 14, 1975, plaintiff amended his complaint by naming OMC a co-defendant in a count premised on strict products liability. On November 14, 1975, the railroad filed a counterclaim seeking indemnity from OMC on a theory of active/passive negligence. Thereafter, the court on OMC's motion dismissed plaintiff's amended complaint because the applicable statute of limitations had expired. The railroad then filed a third-party complaint against OMC, the gravamen of

which was that OMC's strict liability for a product it placed in the stream of commerce constituted active negligence while the railroad's F.E.L.A. liability was technical only, thus constituting passive negligence.

Several developments occurred on December 6, 1976, the morning this case was originally scheduled for trial. Plaintiff requested and was granted leave to strike the various negligence allegations in its amended complaint and to insert therefor the following allegation:

"Failed to provide plaintiff with reasonably safe equipment with which to do his work in that the motor scooter provided him was defective in design in one or more respects."

The railroad promptly admitted liability under this count and amended its third-party action by deleting any mention of active/passive negligence and substituting indemnity based upon pure strict liability as its new theory of recovery. On the railroad's motion, the court entered an order *in limine* precluding OMC from eliciting testimony that, *inter alia*, plaintiff or the railroad had been negligent and that prior to the accident rags or paper cups had been used on the filler spout. Counsel for OMC requested that the amended third-party complaint be dismissed as untimely filed and as constituting unfair surprise, that the indemnity action be severed from the primary F.E.L.A. suit or that the case be continued to allow adequate time for preparation of a defense to the railroad's new theory of liability. The court postponed the trial for one week.

Third-party defendant OMC contends on appeal that the indemnity action based on principles of pure strict liability was not maintainable, that the court improperly restricted evidence of its defenses of assumption of risk and misuse of the product through the order *in limine*, various evidentiary rulings and the refusal of certain instructions, and that the railroad should be estopped from seeking indemnity because of its apparent collusion with the plaintiff prior to trial. OMC's other contentions of error shall be discussed only insofar as they have bearing on our discussion or might arise on retrial of the case.

It is true, as OMC asserts, that although arising in the context of a railroad employee's claim for damages under the F.E.L.A., and although partaking of product liability principles, this action is and has been an action seeking common law indemnity. The trial court proceedings thus involved two separate and distinct actions—the F.E.L.A. action by McCaffrey against the railroad and the railroad's action for indemnity against appellant OMC. As previously noted, the railroad amended its action for indemnity shortly before trial, substituting strict products liability for active/passive negligence. Throughout the trial the railroad predicated its entire theory of recovery on strict products-liability principles. In this appeal OMC contends for the first time that the

railroad's indemnity action must proceed under ordinary equitable principles of active/passive negligence. Citing *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460, OMC contends that the railroad's recovery must be based on the qualitatively greater degree of negligent conduct on the part of OMC and that direct and active negligence on the railroad's part precludes recovery. Since the trial court barred the introduction of any matter relating to the railroad's negligence, OMC argues that the error pervaded the entire trial, requiring reversal.

Recognition of indemnity based on strict liability principles finds support in the facts of *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182. *Suvada* involved an action for indemnity brought by the purchasers of a reconditioned tractor trailer unit for sums they paid in settlement of property damage and personal injury claims resulting from an accident caused by a defective brake. Establishing strict products liability in this State, the supreme court upheld the indemnification action in spite of the fact that the plaintiffs had been injured only to the extent of sustaining financial loss as a result of the defective brake. A similar result was reached in *Texaco, Inc. v. McGrew Lumber Co.* (1969), 117 Ill. App. 2d 351, 254 N.E.2d 584.

In *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1975), 62 Ill. 2d 77, 338 N.E.2d 857, the assembler of a product, having settled strict liability actions for personal injuries brought against it, filed an indemnity action against the producer of a defective component part. There the defendant argued that since the compensation of a consumer injured by a defective product was not involved in that litigation, the two manufacturers should simply be treated as joint tortfeasors, with no indemnity allowed unless one's negligence was passive and the other's active. Recognizing upstream indemnification in the manufacturer-distributor-seller chain, the court placed the assembler in the place of the consumer and the defendant producer into the place of the assembler in order to shift the full economic loss to the producer:

> "In our judgment, the rule we are adopting is a logical and necessary extension of the principles enunciated in *Suvada* and *Williams*. It does not impose an undue burden on defendant and those similarly situated, for it is they who originated the defective product. Nor does it make them absolute insurers of the safety of their products. Plaintiffs in such indemnity actions must still prove the necessary elements of a strict liability action—that the product contained a defective condition which existed at the time it left defendant's control, rendering the product unreasonably dangerous and proximately causing the injury resulting in plaintiff's liability to the injured party. And while proof of an indemnitee's negligence will not serve to bar a strict liability

indemnity claim, proof that he misused the product or assumed the risk of the defect will be an effective bar to recovery." 62 Ill. 2d 77, 84-85.

▪▪ Nor do we believe that the manufacturer-assembler relationship existing between the plaintiff and defendant in *Liberty Mutual* serves as a proper basis for distinguishing it from the facts in this case. The public policy reasons for the adoption of strict liability enunciated by our supreme court in *Suvada* were that the economic loss suffered by the user or consumer should be borne by those who created the risk and reaped the profit by placing the product in the stream of commerce. Allowing the railroad in this action to be included in that group entitled to indemnity from OMC on strict liability grounds is consistent with this public policy.

In conjunction with its argument that this action must be based on active/passive principles, OMC complains of an order *in limine* requested by the railroad which prohibited OMC's counsel from commenting on or offering into evidence:

"1. Any matter concerning any negligence on the part of Illinois Central Gulf Railroad Company or on the part of plaintiff * * *."

▪▪ There can be no doubt that the fault-weighing process of active/passive negligence is irrelevant in determining any grant of indemnification predicated on strict products liability. As the court in *Suvada* noted:

"Indemnity here is not, however, premised on any theory of active and passive negligence. (To require proof that Bendix [indemnitor] was actively negligent would be the antithesis of strict liability.)" 32 Ill. 2d 612, 624.

▪▪ Since liability for a defective product is imposed regardless of whether the defect resulted from the negligence of the manufacturer, negligence is irrelevant for determining liability. This is true regardless of the indemnitee's negligence, whether active or passive. *Texaco, Inc. v. McGrew Lumber Co.* (1969), 117 Ill. App. 2d 351, 254 N.E.2d 584.

▪ While active negligence on the railroad's part is insufficient to bar indemnification, indemnity is not available to the railroad if its conduct in connection with the scooter constituted misuse or an assumption of the risk of its use. Thus, the same recovery-barring standards recognized by the court in *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305, as precluding recovery by consumers are applicable to this situation. OMC contends that it was denied a fair trial when the trial court disallowed certain evidence relating to the railroad's use and misuse of the scooter and when it refused to instruct the jury on the railroad's misuse or assumption of risk.

At trial Thomas Dolan, an engineering consultant and former professor at the University of Illinois, testified as an expert witness for the

railroad. Professor Dolan explained that the scooter involved was designed to accept a special kind of gasoline cap not installed on the machine at the time of the accident. The cap used on the machine at the time was a standard S.A.E. cap with tongs which would not allow it to lock properly in place on the filler spout. Professor Dolan theorized that this loose-fitting cap allowed a significant amount of gasoline to escape the tank, run down onto the muffler and ignite the initial fire. When the scooter overturned, the shock forced it off the filler neck allowing the gasoline to run onto McCaffrey. In Professor Dolan's opinion the loose-fitting gasoline cap, coupled with the location of the gasoline tank in close proximity to the driver and to the muffler, rendered the scooter unreasonably dangerous.

Professor Dolan's conclusions were wholly consistent with McCaffrey's and the railroad's version of how the accident occurred. An improperly fitted gasoline cap caused a fire on his leg which he attempted to extinguish, causing the vehicle to overturn and spill even more fuel on his body. Thus, the focus of the entire incident was the gasoline cap. Properly fitted, there would have been no fire initially nor would gasoline have escaped when the vehicle overturned. Accordingly, evidence of the railroad's conduct relating to the filler cap is of great significance to the question of liability.

In its answer to the railroad's amended third-party complaint, OMC included certain defenses of misuse and assumption of risk. While the answer was not included in the record on appeal, we are able to ascertain the substance of the defenses through the transcript of arguments conducted in chambers. Counsel for the railroad objected to the form of the defenses and argued alternatively for an order *in limine* excluding any reference to misuse or assumption of risk until such time as OMC introduced evidence enabling those issues to be submitted to the jury. After OMC's counsel orally amended the defenses to conform in part to the previously voiced objections, the court struck all of OMC's defenses.

As part of the previously discussed order *in limine* requested by the railroad, OMC was precluded from commenting upon or offering into evidence:

"8. Any matter pertaining to use of rags or paper cups on the filler spout prior to the accident."

Based on this order, counsel for OMC was prohibited from cross-examining the plaintiff regarding the use, handling, and condition of the cap and filler spout before the accident. Apparently concluding that misuse of the product concerned only the manner in which the scooter was being used at the time of the accident, the court restricted questioning to the day of the accident. Later, during the cross-

examination of co-worker Robert Carroll, OMC was limited in its questions regarding the prior usage and treatment of the vehicle.

It is difficult to ascertain from the record the exact basis for excluding this evidence. The railroad strenuously argued that such evidence involving knowledge of problems relating to the filler spout and cap, and the prior handling of these parts of the machine was irrelevant to the strict liability action. This argument was ostensibly premised upon the ground that the product defect involved OMC's failure to warn that only gasoline caps ordered and supplied from OMC would properly fit the gasoline tank filler spout. Thus, prior conduct had no bearing on the defect since the defect involved a failure to warn. While the court's rulings showed a tacit acceptance of this position at times, the following remarks of the court in response to OMC's efforts to clarify the scope of the court's rulings demonstrate a different basis for excluding the evidence:

> "That's correct, unless you show some modification. If you have got evidence to show modification of the design of that by the railroad, I will let that in."

■■ Considering the respective theories and arguments of the parties and reviewing the evidence adduced at trial in its entirety, we believe the trial court unduly restricted OMC's scope of inquiry on matters relating to misuse of the scooter and assumption of the risk of its use. Misuse of a product involves using a product for a purpose neither intended nor foreseeable (objectively reasonable) by the defendant while assumption of risk consists of voluntarily and unreasonably proceeding to encounter a known danger. (*Williams v. Brown Manufacturing Co.*) We know of no authorities which restrict the application of misuse or assumption of risk to situations where the design of the product has been altered or modified by the user. Rather, both concepts focus on the actual conduct of the user in the use and operation of the product. For these reasons, evidence relating to the prior use of rags or cups on the filler spout or of knowledge on the part of the railroad relating to the improper fit of substitute gasoline caps relates directly to these available defenses. Refusing to allow this evidence requires that this cause be reversed and remanded for a new trial.

■■ Another question which may arise in the retrial of this matter involves the trial court's order allowing the railroad to elicit testimony regarding a change in the design of the vehicle while refusing to allow OMC to show the reason the design change was instituted. The railroad established through the testimony of a design engineer for OMC that the gasoline tank had been repositioned on vehicles manufactured after the one involved in McCaffrey's accident. This evidence was introduced to establish the design feasibility of relocating the tank which, in part,

accounted for the dangerous character of the vehicle. OMC argued at trial that the reason for making the change had no relation to the cure of any defective condition but was instead a response to consumer demand for a different usage of the scooter. Relying specifically on *Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 281 N.E.2d 749, the trial court prohibited any evidence of the reasons underlying the design modification unless such evidence related to design feasibility or otherwise came within the purview of *Sutkowski*. OMC contends in this appeal that the exclusion of such evidence prevented a fair and proper jury determination of the allegation of defective design. In essence, OMC argues that the motivation for the design alteration is the significant factor rendering such evidence logically probative. Thus, when the design alteration is motivated by some "non-safety" reason, the logic of *Sutkowski* is inapplicable. We do not agree. The application of *Sutkowski* does not require a showing that a design alternative was intended to improve the safety of a product. Rather, *Sutkowski* allows the introduction of evidence relating to feasible design alternatives relating to and improving on defects existing in products in question. Since it is the product itself which bears scrutiny and not the conduct of the manufacturer in producing it, evidence of the underlying motivation for the design alternative is not relevant.

Contending that the railroad collaborated with McCaffrey in restructuring the pleadings and in restricting the issues, OMC argues that the railroad is estopped from obtaining indemnity for a judgment it unilaterally submitted to and failed to defend. OMC initially asserts that indemnity should be denied since the railroad's F.E.L.A. liability to McCaffrey could not be premised on the design defect as alleged in plaintiff's amended complaint. OMC points out that any design defects existing as alleged in McCaffrey's complaint must proceed from the manufacturer (OMC) and could not be attributable to the railroad's negligence. Thus, OMC argues that the existence of a design defect bringing about the injury necessarily negates any liability on the part of the railroad to McCaffrey, since the existence of the one is the antithesis of the other. By submitting to liability under McCaffrey's amended complaint, the railroad accordingly acted as a volunteer.

■ Having reviewed the authorities on this point (see, *e.g., Shenker v. Baltimore & Ohio R.R. Co.* (1963), 374 U.S. 1, 10 L. Ed. 2d 709, 83 S. Ct. 1667) we conclude that the F.E.L.A. imposes on railroads a nondelegable duty to provide its employees with a reasonably safe place to work and with reasonably safe appliances and machinery with which to do their work. McCaffrey's amended theory of liability was that the railroad negligently provided a defectively designed scooter. Certainly the existence of a design defect rendering the scooter unreasonably

dangerous is not inconsistent with F.E.L.A. liability for negligently providing such a defective instrument to an employee.

As a further ground for estoppel, OMC asserts that the railroad, while ostensibly opposing plaintiff's damages, filed a motion *in limine* precluding any evidence of McCaffrey's negligence. Pursuant to section 3 of the Federal Employers' Liability Act, evidence of an employee's contributory negligence is admissible to mitigate damages although it does not bar recovery altogether. In addition, section 25 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 25) affords a third-party defendant the benefit of any defenses which the third-party plaintiff has against plaintiff's claim. By seeking and obtaining an order prohibiting the introduction of this evidence, the railroad was directly responsible for enhancing plaintiff's damages. However, we do not believe this action alone merits outright reversal of the railroad's indemnity suit. Nevertheless, on retrial OMC should be allowed to assert the railroad's partial defense of McCaffrey's contributory negligence.

OMC argues at length in its brief that various last minute maneuvers in the trial court point to collusion between McCaffrey and the railroad, thus barring the railroad's action for indemnity. While the sequence of events and the sudden, radical shift in theory coupled with an immediate admission of liability on the part of the railroad lend some support to OMC's contention, we believe that OMC's silence in the trial court on this point has caused the issue to be waived. At any rate, our disposition of this case will allow many of these alleged errors to be cured upon retrial.

Finally, the railroad asserts that OMC's failure to request as alternative relief in this appeal that the cause be remanded for a new trial constitutes a waiver of various trial errors discussed in OMC's brief. While we agree that such failure to request a new trial on appeal may under some circumstances constitute a waiver of alleged error, we believe that the failure in this case is technical only. OMC has asserted various grounds on appeal relating to the introduction of evidence or to the conduct of trial proceedings which require as a proper remedy remandment for a new trial. In addition, we are empowered by virtue of Supreme Court Rule 366 (Ill. Rev. Stat. 1977, ch. 110A, par. 366) to "grant any relief, including a remandment, * * * that the case may require."

For the foregoing reasons, we believe the appropriate remedy in this cause is that the cause be reversed and remanded to the circuit court of Madison County for a new trial.

Reversed and remanded.

JONES and KUNCE, JJ., concur.