ROBERT WILSON, Plaintiff-Appellee, *v.* NORFOLK AND WESTERN RAILWAY COMPANY, Defendant and Third-Party Plaintiff-Appellant.— (Baker Equipment Engineering Co., Inc., Third-Party Defendant-Appellee.)

Fifth District   No. 81—496

Opinion filed September 1, 1982.

Karl D. Dexheimer, of Pope and Driemeyer, of Belleville, for appellant.

Michael B. Constance and Edward J. Szewczyk, both of Donovan, Hatch & Constance, P. C., of Belleville, for appellee Baker Equipment Engineering Co., Inc.

Jerome Mirza & Associates, Ltd., of Bloomington (Jerome Mirza, of counsel), for appellee Robert Wilson.

JUSTICE WELCH delivered the opinion of the court:

On October 27, 1977, the plaintiff, Robert Wilson, was employed as a road electrician for the Norfolk and Western Railway, and had been so employed for approximately a year. The position of road electrician was, in railroad terminology, equivalent to that of a lineman for a power company, and Wilson had over 30 years' experience as a journeyman lineman. That day, he was performing work in Norfolk and Western's Fort Wayne, Indiana, yard while 25 or 30 feet above ground level in the fiberglass bucket of a piece of machinery known as the Baker B—10 digger-derrick. During this work, he came in contact with high-voltage wires and suffered severe burns on his chest and left hand.

The plaintiff instituted the present action against his employer in the circuit court of Madison County. He alleged that his employer was liable to him under the Federal Employers' Liability Act (45 U.S.C. secs. 51 through 60 (1976)), specifically because it had failed to provide him with a safe place to work, because it had not given him a stable bucket in which to do elevated work, and because it had not furnished him with sufficient assistance to enable him to work in reasonable safety. Norfolk and Western, in turn, filed a third-party complaint against Baker Equipment Engineering Co., Inc., claiming that any injury sustained by the plaintiff was caused by the failure of

Baker to design and manufacture a safe bucket truck. The case was tried before a jury, which found for the plaintiff in the amount of $618,750, and which found against Norfolk and Western in its third-party action. Norfolk and Western appeals from the trial court's entry of judgment on both of these verdicts, and argues that several errors acted to deprive it of a fair trial.

The appellant's first group of arguments relates to a prior inconsistent statement given by the plaintiff. At trial, one of the plaintiff's theories of recovery, as corroborated by his own testimony, was that the fiberglass bucket had tipped while he was working in it, forcing him into contact with the energized wires. After his injury, the plaintiff had dealings with Norfolk and Western claim agent Maurice Woods, who directed that a statement be taken from the plaintiff on January 4, 1978, and transcribed. In the course of that statement, the plaintiff gave his opinion that the bucket did not tip.

Norfolk and Western's attorneys took a deposition of the plaintiff on September 12, 1978. When the plaintiff was asked about the earlier statement, his counsel responded:

"I have read the statement, and I believe the circumstances under which it was obtained by a railroad claim agent, and I find nowhere that the railroad that he was not required to talk to the railroad claim agent or have benefit of counsel at that time. [*Sic.*] So, under those circumstances, I expect this statement would be held to be non-usable by the defense counsel, so I won't let the witness answer any questions regarding that statement."

On November 3, 1978, Norfolk and Western filed a motion to compel the plaintiff to answer questions pertaining to the previous statement, as well as certain other questions not pertinent to this appeal. That portion of the motion dealing with the statement to claim agent Woods was denied.

At trial, counsel for the railroad cross-examined the plaintiff about the contents of the statement. Counsel asked if the plaintiff had told Woods that the bucket had not tipped, and the plaintiff replied in the affirmative. The plaintiff was also asked why he had said that, and the plaintiff stated that "that's what he [Woods] wanted me to say."

On redirect examination, plaintiff's counsel inquired into the circumstances surrounding the giving of the statement. Counsel for the railroad objected to this line of inquiry because, among other grounds, the plaintiff had not been required to provide information about the statement when his deposition was taken. These objections were overruled.

The plaintiff recalled that Woods had picked him up at the hospital in Springfield, Illinois, when he was discharged from it on December 7, 1977. During the ride home, Woods told the plaintiff that he had a $500 check available at his office to cover the plaintiff's personal expenses. The plaintiff picked up that check a week later. About the first of January 1978, the plaintiff requested $1,000 more for personal expenses, and Woods allegedly told him that "the people in Roanoke [Va.]" first wanted a statement from him, since he had not filed an accident report. An appointment with a court reporter was later scheduled for January 4.

On that day, the plaintiff remembered, he came to Woods' office about an hour and a half before the reporter arrived. The plaintiff testified that he told Woods that he was injured when the fiberglass bucket moved. According to the plaintiff, Woods informed him that "the people in Roanoke" would not want the equipment criticized in the statement. The statement was taken, beginning at 10 that morning and concluding before lunch. The plaintiff received the requested $1,000 check after lunch.

Continuing the redirect examination, plaintiff's counsel asked whether the plaintiff had sought another advance from Woods after the statement was taken. He testified that, several weeks after January 4, he asked Woods for $925 for car insurance premiums. Woods told him that this would have to be approved by his superiors in Roanoke. A few days later, the plaintiff telephoned Woods to inquire about the advance, and Woods allegedly informed the plaintiff that he had already drawn advances which were "too near what the actual settlement would be," and therefore no more advances could be given.

The railroad called Maurice Woods to testify in its case in chief. Woods testified that, during the ride home from the hospital on December 7, 1977, he did not discuss money or settlement with the plaintiff. He also stated that, on January 4, 1978, the plaintiff arrived at his office only "a few minutes" before the statement was taken. Woods denied telling the plaintiff either that the railroad officials would not want to hear their equipment criticized or that any further advances were contingent upon the plaintiff's giving of a statement. He did recall that the plaintiff received an advance of $1,000 on the afternoon of January 4.

In February 1978, according to Woods, the plaintiff requested $3,500 to buy a new camper. Woods called Jack Ward, his superior, who told him that an advance could not be made for that particular purchase although further advances could be made to assist the plaintiff in obtaining necessities. Also in February 1978, the plaintiff re-

quested that Woods send him a check for $950 for living expenses, including insurance premiums. Woods forwarded the request to Roanoke, but heard nothing more about it until the plaintiff called him to find out about the advance some time in March. Woods called his superiors, who informed him that the plaintiff was currently represented by an attorney and that therefore the requested advance should be denied.

Robert Hansen, who was a claim agent who had worked with Maurice Woods, also testified for the railroad. He had accompanied Woods to pick the plaintiff up at the hospital on December 7, 1977. Hansen testified that neither money nor settlement was discussed with the plaintiff at that time.

In rebuttal, the plaintiff called Thomas Dailey, who had formerly worked as a claim agent with Woods. Dailey testified that he had some knowledge of the plaintiff's claim, but he had not personally given the plaintiff any advances. According to Dailey, the plaintiff was in Maurice Woods' office at 8 a.m. on January 4, 1978, and the plaintiff was heard to tell Woods, before the reporter arrived, how the accident occurred. Dailey said that it was standard procedure for Norfolk and Western claim agents to review the facts with a claimant before a statement was made of record. Finally, Dailey alleged that Woods had told him, before the plaintiff's statement was taken, that he had the plaintiff "in the palms of his hands." Jack Ward, assistant chief claim agent for Norfolk and Western, testified as a surrebuttal witness that Dailey had been dismissed from the service of the railroad because he would not accept a transfer from Decatur, Illinois, to Fort Wayne, Indiana. In Ward's opinion, the decision to transfer Dailey was made because of Dailey's unsatisfactory work, because of a personality conflict with Maurice Woods and because of complications due to Dailey's outside business interests in Decatur.

The railroad objects to the exchange, as set forth in detail above, for four reasons. First, it argues that the failure of the court to allow it to examine the plaintiff about the statement during discovery resulted in unfair surprise when the plaintiff testified about the statement on redirect examination. Second, it is claimed that the plaintiff's explanation of the giving of the statement went far beyond the scope of cross-examination, in that he testified about events which occurred as early as a month before the statement was given and as late as a month after that date. Third, the rebuttal testimony of Thomas Dailey is characterized as improper impeachment by extrinsic evidence on collateral matters. Finally, throughout the course of the evidence on the plaintiff's dealings with the claim agents, the railroad contends that numerous impermissible references to settlement negotiations

were made. We only need address the first of these arguments.

The Illinois Supreme Court Rules pertaining to discovery (87 Ill. 2d Rules 201-219) have been broadly construed in order to encourage extensive pretrial disclosure. (*Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460; *Monier v. Chamberlain* (1966), 35 Ill. 2d 351, 221 N.E.2d 410.) The parties to litigation are entitled to inquire into matters which will be admissible at trial, as well as information which only leads to matters admissible at trial. (*Elliot v. Board of Education* (1975), 31 Ill. App. 3d 355, 335 N.E.2d 33; *City of Bloomington v. Quinn* (1969), 114 Ill. App. 2d 145, 252 N.E.2d 10.) Control of the discovery process is vested in the discretion of the trial court, and any orders made concerning discovery will not be modified on appeal unless the appellant makes an "affirmative showing of abuse." *Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 377 N.E.2d 1125.

The railroad argues that the trial court erred in denying its motion to compel the plaintiff to answer questions pertaining to the circumstances under which his statement was taken by claim agent Woods. Counsel for the railroad and for the plaintiff correctly note that *Schusler v. Fletcher* (1966), 74 Ill. App. 2d 249, 219 N.E.2d 588, holds that a witness' explanation of his reasons for giving contradictory statements is admissible at trial. Therefore, since there is no doubt of the admissibility of the information sought by the railroad's counsel at the plaintiff's discovery deposition, and since none of the parties suggests the existence of any privilege or other facts which would render the information exempt from discovery, we agree that the court abused its discretion in not compelling the plaintiff to answer questions about his statement to claim agent Woods.

But, this type of error does not automatically compel the reversal of a judgment. Admission at trial of evidence which should have been disclosed during the discovery process but was not is not reversible error absent proof that prejudice resulted from the erroneous restriction of discovery. (See *Schranz v. I. L. Grossman, Inc.* (1980), 90 Ill. App. 3d 507, 412 N.E.2d 1378; *Smith v. Realcoa Construction Co.* (1973), 13 Ill. App. 3d 254, 300 N.E.2d 855.) Here, the railroad contends, as it did at trial, that it was surprised by the plaintiff's version of the events under which his statement was taken. It is claimed that, had the railroad known of the damaging nature of the accusations which the plaintiff would make against its claims employees on redirect examination, it would not have attempted to impeach him on cross-examination by referring to his prior inconsistent statement to claim agent Woods.

We believe that these allegations constitute a showing of prej-

udice to the railroad sufficient to require reversal. The trial court's denial of the railroad's motion to compel answers about the prior statement forced the railroad to proceed to trial with less than adequate preparation. Without knowing the substance of the plaintiff's potential testimony concerning the statement, the railroad could not have been able to make an informed decision whether or not to impeach him with it. And, it cannot be said that the railroad had constructive knowledge of the taking of the statement due to the presence of its claims employees at that proceeding, because the plaintiff's version of that event, which is what the railroad claims to have been surprised by, was entirely different from the version given by agent Woods.

The plaintiff argues that the overwhelming nature of the evidence against the railroad renders the discovery violation harmless at most. We do agree that substantial evidence has been introduced to prove the railroad's liability to the plaintiff, but given the size of the verdict rendered in favor of the plaintiff, we are not convinced that the judgment was unaffected by the testimony concerning the railroad's claims practices. The railroad was certainly at a disadvantage in not knowing how the plaintiff would explain his earlier statement, and compelling the railroad to proceed without that knowledge deprived it of a fair trial and mandates a new one. (*Cox v. Yellow Cab Co.* (1973), 16 Ill. App. 3d 665, 306 N.E.2d 738, *aff'd* (1975), 61 Ill. 2d 416, 337 N.E.2d 15.) A contrary holding would neutralize the beneficial effects of the discovery rules.

Baker Equipment Engineering Co. requests this court to affirm the third-party judgment in its favor, regardless of the disposition made of the plaintiff's action against the railroad. Baker asserts that "the evidence relevant to the third party action was presented in a straight forward manner, the jury was properly instructed on that aspect of the case, and returned a consistent verdict supported by the evidence." The railroad's theory in its third-party action was that, if it failed to comply with the Federal Employers' Liability Act, its failure was due to the fact that the Baker B—10 digger-derrick was not reasonably safe. Baker denied these allegations and also contended, in an affirmative defense filed during trial, that the railroad assumed any risks posed by the instability of the fiberglass bucket on the B—10.

A digger-derrick is similar in appearance to what is commonly known as a "bucket truck." However, the primary purpose of the digger-derrick is to dig holes for utility poles and set them into those holes. On the B—10, a fiberglass bucket was available, not as standard equipment, but as an option. It would pin onto the truck's boom,

which would carry a worker so as to enable him to perform elevated work.

The alleged defect in the B—10 digger-derrick consists of the absence of a brake to lock the otherwise free-swinging bucket into place when desired by the workman. At trial, it was noted that some bucket trucks are made with hydraulically operated buckets, and the bucket is held in place by the hydraulic mechanism, even when the bucket is being raised. Other models, including other digger-derricks, are fitted with handbrakes, which the workman can engage when he reaches his working position. All witnesses who were employed by Baker agreed that a brake was not listed as a standard option on the B—10, and those witnesses for Baker and for the railroad who were involved with the purchase of the B—10 in which the plaintiff was injured, stated that they did not discuss the possibility of a brake for the bucket. Gary McAlexander, vice-president of Baker, testified that his company had furnished brakes on B—10's to several customers, and that this modification had cost the customer between $200 and $250. He also recalled that Baker marketed a digger-derrick by a competitor, Tel-E-Lect, which did offer a brake as an option. Because the B—10 was an older model, although still unused, it sold for approximately $7,500 less than the comparable Tel-E-Lect model.

The two Norfolk and Western employees who participated in the purchase of the B—10 were F. H. "Tiny" Wilbourn, the railroad's director of automotive equipment, and Clyde Board, the plaintiff's immediate supervisor. Both Wilbourn and Board stated that they informed Baker employees McAlexander and William McKnight that they intended to use the B—10 for work on high voltage lines and McAlexander and McKnight did not tell them that this use would be inappropriate. Board said that he requested McKnight to obtain a longer jib for the B—10 so that it could reach the 55-foot tall poles from which the high voltage wires were suspended. According to Board, McKnight told him that he could not comply with this request because of OSHA specifications.

William McKnight testified that after the sale of the B—10 had been completed, he travelled to Decatur, Illinois, to instruct railroad personnel, including Clyde Board, about the use of the B—10. He stated that he informed these employees that the B—10 should not be used for any work around live wires, and he recalled that the primary purpose for his trip was to make certain that this warning was understood. McKnight also noted that he demonstrated that the bucket of the B—10 could tip. Board remembered speaking with McKnight after the B—10 was delivered, but he recalled that McKnight assured him that it would be safe for live wire work.

It is undisputed that the railroad's employees did not indicate to Baker that they were dissatisfied with the B—10 because it did not have a brake. The plaintiff, who began working with the railroad about a year after the B—10 was purchased testified that he told Clyde Board that the equipment he had used in his earlier employment had some sort of brake. Board responded that the railroad did not buy that type of equipment.

■ ■ As Baker correctly indicates, a plaintiff assumes the risk of a defective product "only if he is actually aware of the defective nature of the product and appreciates its unreasonably dangerous character, but chooses voluntarily to act in disregard of such danger." (*Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206, 213, 407 N.E.2d 32, 35; *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) This inquiry is normally for the jury. (*Thomas.*) In the present case, conflicting evidence was presented concerning the state of the railroad's knowledge of the safety of the B—10 for live wire work. Essentially, a question of credibility arose between Baker employees McAlexander and McKnight on one hand and railroad employees Board and Wilbourn on the other. Because we cannot say that the resolution of this credibility issue, and thus the verdict in favor of Baker, was unaffected by the testimony concerning the railroad's claims practices, we must also reverse the judgment in the third-party action and remand it for a new trial as well.

Having concluded that a new trial is required in this cause, we will address those of the railroad's remaining assignments of error which are likely to arise again upon remand. Specifically, the railroad challenges the court's rulings on the admissibility of certain custom and practice evidence as well as certain photographs and also takes issue with the instructions given to the jury.

It is undisputed that when he was injured the plaintiff was not wearing the insulated safety gloves issued to him by the railroad. He received burns on his left hand and his chest. It is also undisputed that, although he was assisted by co-worker Tony Bradford while he completed the work on the live wires on the morning of October 27, the plaintiff was working alone when he was injured on that afternoon. The plaintiff testified that he passed out upon being injured, and, when he regained consciousness, he lowered the bucket by operating the controls with his right hand. He shouted for assistance, and other railroad workers responded to his calls.

Norfolk and Western's safety rule 1264 required a workman to wear certain protective equipment "when it is necessary to work on energized electrical wires or apparatus," the equipment to vary according to the voltage in the wires or apparatus. Before trial, the

plaintiff filed a motion *in limine* to prevent the railroad from introducing the safety rules or practices of any organization other than the railroad regarding the wearing of safety gloves. This motion was granted.

The railroad filed its own motion *in limine* to prohibit the plaintiff from referring to any safety rules or to the "rules, customs or practices" of any organization other than the defendant concerning the number of men required to do a job such as the one performed by the plaintiff when he was injured. The court allowed the motion insofar as it related to safety rules, but denied that portion of the motion which sought to prevent the introduction of custom and practice testimony.

At trial, several witnesses presented their own interpretations of Norfolk and Western rule 1264. Tony Bradford and Clyde Board stated that they read that rule to require the use of safety gloves when a workman was working on a pole within the vicinity of live wires. The plaintiff testified that, since he was working on a dead cross-arm and not a live wire, rule 1264 did not mean that he had to wear gloves. Frank Stevens, manager of operations for the Cornbelt Electric Cooperative in Bloomington, Illinois, testified that he agreed with the plaintiff's reading of the rule.

Tom Hentz, operations supervisor for the Southwestern Electric Co-operative in Greenville, Illinois, also interpreted rule 1264, although he did not do so in testimony before the jury. In an offer of proof by the railroad, he stated that, while it would have been the practice for employees of his organization to wear gloves during work such as that performed by the plaintiff when he was injured, the railroad's rule did not require the plaintiff to do so. Hentz noted that the relevant safety rule at Southwestern specified that gloves were to be used when the workman was "within reaching or falling distance" of an energized line. According to Hentz, the safety rules employed by power companies varied widely, some reading like Southwestern's rule and others, like that followed at Illinois Power Company, necessitating gloves only when work was done "on" live lines. In further testimony on this offer of proof, Frank Stevens stated that Cornbelt used the same rule that Southwestern used.

Hentz and Stevens testified before the jury that it was the custom and practice of their respective employers to require a work crew of at least two employees when a job had to be done from an elevated bucket around live wires. Some ground work, they stated, was performed by their workers without assistance.

The railroad assigns as error the evidentiary rulings which allowed the presentation of all of this testimony. It argues that it should

have been permitted to introduce evidence of the safety rules and customs and practices of other companies concerning the wearing of safety gloves, and it contends that Frank Stevens was not qualified to interpret its rule 1264. The railroad also claims that the plaintiff should not have been permitted to offer the testimony of Stevens and Hentz on the number of men required for elevated work, because the testimony was irrelevant and because Stevens and Hentz had no experience working in the railroad industry. We consider these arguments in the order presented above.

At issue in our review of the court's order granting the plaintiff's motion *in limine* is whether a defendant railroad in an FELA action may introduce safety rules, customs and practices of other railroads to show the contributory negligence of the plaintiff, even though it has promulgated its own safety rule which specifically applies to the allegedly negligent conduct of the plaintiff. Our research has uncovered no authority which directly answers this question, nor have the parties directed us to any such authority.

In *Genzel v. New York, Chicago & St. Louis R.R. Co.* (1928), 249 Ill. App. 164, the plaintiff requested the defendant to furnish him with its book of operating rules, and it did. However, the plaintiff introduced a witness, Lawrence, who testified concerning his own interpretation of the rules of the Wabash Railroad Company. Lawrence, who had been a conductor on some railroad, but not the defendant, stated that the Wabash rules were standard rules which had been adopted by 32 railroads, including the New York Central system, of which the defendant was said to have been a member. The defendant proved that it was not a member of the New York Central system, and it objected to the use of the Wabash rules. The defendant was denied permission to show that it had not adopted the Wabash rules, and those rules, along with Lawrence's interpretation of them, were admitted into evidence.

On appeal, the court agreed with the defendant that this constituted error. It stated:

> "The effect of this ruling was simply to permit a witness, who had no knowledge whatever of what rules the appellant company was operating under, to testify that the appellant was operating under what was called "Standard Rules," or such rules as had been adopted some time in the past, not by appellant but by the Wabash Railroad Company, and this notwithstanding the fact that upon notice appellant produced its own rules in court and offered them to counsel for appellee. The rules of the Wabash Railroad Company, and the elucidation thereof by this witness, were wholly incompetent evidence." (249 Ill. App. 164,

173.)

The trial court's admission of the Wabash rules was thus improper not only because it incorrectly suggested that the defendant operated under them, but also because, since the defendant had promulgated its own rules, those of the Wabash were not relevant.

We believe that a similar conclusion should be reached concerning the relevancy of safety rules, customs and practices of other railroads in this case. A railroad has, in general, a duty to establish safety rules for the guidance and protection of its employees. (*Goodman v. Chicago, Burlington & Quincy R.R. Co.* (1937), 289 Ill. App. 320, 7 N.E.2d 393, *cert. denied* (1938), 303 U.S. 640, 82 L.Ed. 1100, 58 S. Ct. 610.) Once these rules have been promulgated, the employees are entitled to rely upon them as the appropriate standard of conduct (*Kurn v. Stanfield* (8th Cir. 1940), 111 F.2d 469), unless they have been effectively nullified by the custom and practice of those employees. (*Hval v. Southern Pacific Transportation Co.* (1979), 39 Or. App. 479, 592 P.2d 1046.) Consequently, it has been held that a railroad's safety rules or customs are admissible in an FELA action, either as evidence of the negligence of the employer (*Coleman v. Gulf, Mobile & Ohio R.R. Co.* (1958), 17 Ill. App. 2d 220, 149 N.E.2d 656), or as evidence of the contributory negligence of the plaintiff (*Nickell v. Baltimore & Ohio R.R. Co.* (1952), 347 Ill. App. 202, 106 N.E.2d 738; *Schwartz v. Alton & Southern Ry. Co.* (1976), 38 Ill. App. 3d 528, 347 N.E.2d 829), so as to diminish his recovery proportionately.

Neither the plaintiff nor the railroad disputes the admissibility of the rules and customs of the particular railroad which is the defendant. But the railroad argues that the rules and practices of other carriers are also probative of the plaintiff's contributory negligence. In support of this theory, the railroad refers us to authorities in which such evidence was introduced against the defendant railroad. *Crabtree v. St. Louis-San Francisco Ry. Co.* (1980), 89 Ill. App. 3d 35, 411 N.E.2d 19; *Campbell v. Chesapeake & Ohio Ry. Co.* (1962), 36 Ill. App. 2d 276, 183 N.E.2d 736; Annot., 43 A.L.R.2d 618 (1955).

The rationale for admitting the customs and rules of other railroads against a defendant railroad is, however, entirely absent when that evidence is sought to be introduced against a plaintiff employee. Industry practice is the yardstick against which a railroad's actions must be judged, and is the proper measure of its negligence, except when that industry practice is not reasonable. (*Kuberski v. New York Central R.R. Co.* (2d Cir. 1966), 359 F.2d 90, *cert. denied* (1967), 386 U.S. 1036, 18 L. Ed. 2d 600, 87 S. Ct. 1475.) A railroad, being an equal member of the railroad industry, may always exchange ideas with other railroads and adjust its safety practices according to tech-

nological and other advances.

■ The individual employee is not in a position to compare his work habits with those of employees of other railroads. He must conform his behavior either to the written safety rules promulgated by his employer or to the customs and practices observed by his fellow employees. To allow a defendant to hold a plaintiff to a higher standard of care than that which it prescribes for or tolerates from its employees would be to demand unreasonably prudent behavior from the plaintiff. The more logical rule is that when a railroad promulgates a safety rule, or permits a custom to exist, and the rule or custom specifically covers the plaintiff's conduct, evidence of the rules or practices of other railroads is not admissible as proof of the plaintiff's contributory negligence.

As an additional point of contention concerning the testimony on the wearing of safety gloves, the railroad argues that Frank Stevens was unqualified to interpret its own rule 1264. The railroad does not deny Stevens' 30 years of power company experience, but instead asserts that his lack of qualification stems from his unfamiliarity with railroads in general and railroad safety rules in particular. It is claimed that the trial court should not permit a witness in an FELA case to testify about railroad customs and practices unless that witness has experience or is otherwise familiar with the railroad industry.

In *Crabtree v. St. Louis-San Francisco Ry. Co.* (1980), 89 Ill. App. 3d 35, 411 N.E.2d 19, an expert was deemed qualified to testify concerning the practice of railroad employees in lifting kegs of rail spikes. The court noted that even though the witness was not acquainted with the operations of the defendant, he was familiar with the customs and practices of three railroads and was thus properly permitted to testify. From this holding, the railroad contends that it should be a prerequisite to the admission of expert testimony under the Federal Employers' Liability Act that the expert be from within the railroad industry.

■ We do not agree that Frank Stevens' lack of knowledge of railroad practices should be a bar to his interpretation of rule 1264. Whether a witness is competent to provide expert testimony is a matter within the discretion of the trial court (*Schwartz v. Alton & Southern Ry. Co.* (1976), 38 Ill. App. 3d 528, 347 N.E.2d 829), and it was not abused in this case. Stevens did not purport to give an opinion about railroad customs and practices; he simply tendered his interpretation of a rule which was similar to rules he had encountered in his employment with utilities. Moreover, and perhaps most significantly, unlike many facets of railroad operation, which have no analogy to other industries, the installation and maintenance of power

lines is common to many concerns, and especially to power companies. Stevens' 20 years' experience as a journeyman lineman followed by 10 years as a line superintendent qualifies him to interpret safety rules governing the wearing of safety gloves during line work, and his lack of experience with a railroad does not alter this conclusion.

It is further argued by the railroad that witnesses Hentz and Stevens should not have been permitted to testify that it was the practice at their respective utility companies to use crews of two linemen when elevated work was to be done. First, the railroad contends that this evidence is not relevant because there was no showing that the presence of an additional crew member would have prevented or minimized the plaintiff's injuries. We agree with this assessment of that evidence, at least in part. It is certainly true, as a practical matter, that a larger work crew could not have prevented the plaintiff from making contact with the live wires, and to that extent evidence of the preferred size of the crew is not relevant. But if, upon remand, the plaintiff introduces evidence to show that his injuries were aggravated by any delay in treatment, or by his having to lower himself from his working position, and he shows that such a delay or the need to lower himself would not have occurred had another worker been present, then we believe that the question of the adequacy of the work crew would be properly at issue.

The railroad also challenges this testimony because the practice discussed by Hentz and Stevens is not of the railroad industry. Our attention is directed to *Chicago, Rock Island & Pacific R.R. Co. v. Lint* (8th Cir. 1954), 217 F.2d 279. There, the plaintiff was injured when cattle which were being unloaded from a boxcar lifted a gate on a loading ramp off of its hinges, and the falling gate, in turn, caused the plaintiff to fall. It was alleged that the pintle hinge, the type used on the gate, was unsafe for use on a loading ramp. The railroad introduced testimony that this hinge was used on loading ramps throughout its system, as well as on a number of farms. In evaluating this latter testimony, the court stated:

> "There is evidence that many farm gates are [equipped with the pintle hinge] but the situation of restraining animals in large farm enclosures is far different from the manner of confining a large number of cattle in a narrow chute. It would seem that the circumstances surrounding the farmer are not similar, at least as a matter of law, to the circumstances surrounding the defendant." 217 F.2d 279, 283.

Drawing an analogy from *Lint,* the railroad asserts that electrical maintenance crews which work for power companies operate under different conditions than do similar crews which work for railroads. It

is argued that power company linemen, which work over large geographical areas, must be accompanied by other crew members because no other power company employees would be at hand in case of an accident. Railroad linemen, on the other hand, are said to work in limited areas, where assistance is readily available. Because of this distinction in circumstances, the railroad urges that evidence of power company practices concerning the number of men on a work crew should not have been admitted.

██ The railroad's theory, which was not offered at trial, does not persuade us that evidence of the power company's customs should be excluded. While certainly having a two-man crew is a practical necessity when working on elevated lines in an isolated area, it does not necessarily follow that this is the sole justification for the practice. Indeed, nowhere at trial was it suggested that power company line crews did not observe this custom even when working in the vicinity of other employees. It is plausible that the second man in the work crew is employed, at least partially, to assist his co-worker if he is rendered unconscious, as happened to the plaintiff here. This situation, of course, arises in the setting of the railroad yard as well as the isolated power line. To us, the circumstances of the power company's line crew are not so dissimilar from those of the railroad line crew as to justify the exclusion of evidence concerning the customary size of the former crew. At most, any distinctions affect the weight of that evidence, not its admissibility.

Next, the railroad contends that the trial court should not have admitted into evidence certain pictures taken of the plaintiff during his recovery from the accident. It is argued that the photographs should have been excluded because they were not produced until trial, well after they were taken, and because they are gruesome. Of course, we need not consider the existence of any discovery violation, because the railroad knows of the photographs well in advance of the date of any new trial to be held in this cause.

██ The decision to admit photographs depicting a plaintiff's injuries rests within the discretion of the trial court. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65.) There is no suggestion that the pictures in question do not accurately depict the plaintiff's injuries during the course of treatment he pursued. We have examined these photographs and find that the trial court's decision to admit them into evidence was a proper exercise of its discretion and did not prejudice the defendant. *De Rosa v. Albert F. Amling Co.* (1980), 84 Ill. App. 3d 64, 404 N.E.2d 564.

The railroad's remaining assignments of error pertain to certain jury instructions which it offered and which were refused or were

given over the objection of the railroad. Three of these instructions concern the plaintiff's FELA action against the railroad and three have to do with the railroad's third-party suit against Baker. We will first discuss those instructions pertinent to the plaintiff's case.

The railroad tendered Illinois Pattern Jury Instructions, Civil, No. 10.03 (2d ed. 1971) (hereinafter cited as IPI Civil), which reads:

"It was the duty of the plaintiff, before and at the time of the occurrence, to use ordinary care for his own safety. That means it was the duty of the plaintiff to be free from contributory negligence."

The plaintiff's objection to this instruction was sustained, and the railroad assigns this ruling as error.

■ Under the Federal Employers' Liability Act, a plaintiff's contributory negligence will not bar his recovery, but will only diminish it. (45 U.S.C. sec. 53 (1976).) Thus, it has been held that a jury instruction which misstates this principle is inappropriate in a FELA action, although it may be proper in an ordinary negligence suit. (*Carter v. Atlanta & Saint Andrews Bay Ry. Co.* (1949), 338 U.S. 430, 94 L. Ed. 236, 70 S. Ct. 226.) While IPI Civil No. 10.03 does not specifically state that contributory negligence would be a bar to the plaintiff's recovery, we believe that it is inaccurate to instruct the jury that the plaintiff must be "free from contributory negligence." This language could create the erroneous impression that judgment should be entered for the defendant if the plaintiff is contributorily negligent to any degree and therefore the court correctly refused this instruction. See *Flanigan v. Burlington Northern, Inc.* (8th Cir. 1980), 632 F.2d 880, *cert. denied* (1981), 450 U.S. 921, 67 L. Ed. 2d 349, 101 S. Ct. 1370; *Seaboard Coast Line R.R. Co. v. Thomas* (1972), 229 Ga. 301, 190 S.E.2d 898.

This court's decision in *Feigl v. Terminal R.R. Association* (1975), 30 Ill. App. 3d 55, 332 N.E.2d 416, does not state otherwise. Although IPI Civil No. 10.03 was presented to the jury in that case and was not held to be error, the opinion shows that the plaintiff did not argue that IPI Civil No. 10.03 incorrectly stated the law of contributory negligence under the Federal Employers' Liability Act. Moreover, the court held that the error complained of, namely the giving of IPI Civil No. 10.03 without IPI Civil No. 11.01, was harmless because the jury was properly instructed that contributory negligence could only serve to diminish or mitigate the plaintiff's damages. We do not believe that the unstated and implied approval of IPI Civil No. 10.03 in *Feigl* is any authority for us to reject the plaintiff's challenge to that instruction in this case. The proper instructions to the jury on the effects of contributory negligence in an injury case under the

FELA are IPI Civil Nos. 160.02, 160.13 and 11.01 (see notes on use to IPI Civil No. 160.02), all of which the trial court gave here.

■■ The railroad further contends that the trial court should have instructed the jury to reduce its award of damages for future pain and suffering to present worth. (*Chiarello v. Domenico Bus Service, Inc.* (2d Cir. 1976), 542 F.2d 883.) This is not the law under the Federal Employers' Liability Act. *McCray v. Illinois Central R.R. Co.* (1957), 12 Ill. App. 2d 425, 139 N.E.2d 817; *Flanigan v. Burlington Northern, Inc.* (8th Cir. 1980), 632 F.2d 880, *cert. denied* (1981), 450 U.S. 921, 67 L. Ed. 2d 349, 101 S. Ct. 1370; *Taylor v. Denver & Rio Grande Western R.R. Co.* (10th Cir. 1971), 438 F.2d 351.

■■ It is also asserted that the trial court should not have instructed the jury on the plaintiff's theory that the railroad was negligent in failing to provide him with "sufficient assistance or help in performing his work." We agree that any such dereliction could not have caused the plaintiff's injuries, as we have discussed earlier. But, if the evidence on remand shows that this omission acted to aggravate those injuries in any way, then this theory is supported by the evidence and this instruction should be given.

Nor does the fact that the plaintiff may have acquiesced in Clyde Board's decision to send Tony Bradford to another yard change our assessment of the instruction. Even if we assume that the plaintiff's conduct can be characterized as some sort of assumption of the risks of working unaided, the appropriate remedy for the railroad would be to submit an instruction to that effect, rather than to request that the instruction on the railroad's negligent conduct not be given.

The railroad's remaining three jury instruction issues pertain to its third-party action against Baker. The first two of these arguments assign as error the refusal of the trial court to give the railroad's instructions No. 18 and 19. These instructions, which are not from Illinois Pattern Jury Instructions, read as follows:

No. 18: Third party defendant, Baker Equipment Company has a non-delegable duty to provide a product which is reasonably safe.

Said duty requires the manufacturer to adapt any and all devices necessary to make its product not unreasonably dangerous.

No. 19: There is no duty on Norfolk and Western Railway to incorporate appropriate safety devices.

An instruction similar to the railroad's instruction No. 18 was given in *Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 252, 417 N.E.2d 154. This instruction read: "It is the duty of the manufacturer

of a product to produce a product which is free from unreasonably dangerous conditions." The court held that the instruction was a correct statement of the law (*Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 326 N.E.2d 74), and that the giving of that instruction did not prejudice the manufacturer. Yet, the court "declined to endorse" the instruction for two reasons. First, the instruction referred to the manufacturer's "duty," and to focus upon the acts or omissions of a defendant, rather than the nature of the product (*Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859) is inappropriate in a products liability action. Second, the instruction neglected to mention the equally correct proposition of law that a manufacturer has no duty to make a product incapable of causing injury. The court concluded that it would be preferable to avoid use of the instruction at issue and instead submit IPI Civil No. 400.01, which properly directs the jury's attention to the defective character of the product.

▮ The same two shortcomings which the court found with the given instruction in *Lundy* are also present in the railroad's tendered instruction No. 18. Consequently, the trial court did not err in sustaining Baker's objections to it, especially since a modified version of IPI Civil No. 400.01, as offered by the railroad, was given.

In a similar way, the railroad's instruction No. 19 is also misleading in that it employs the term "duty" in the context of a products liability action. But more significantly, this instruction fails to mention the railroad's nondelegable duty under the Federal Employers' Liability Act to avoid negligence in providing its employees with reasonably safe equipment. (45 U.S.C. par. 51 (1976); *Shenker v. Baltimore & Ohio R.R. Co.* (1963), 374 U.S. 1, 10 L. Ed. 2d 709, 83 S. Ct. 1667; *McCaffrey v. Illinois Central Gulf R.R. Co.* (1979), 71 Ill. App. 3d 42, 388 N.E.2d 1062.) To the extent that the railroad's instruction No. 19 suggests that the railroad did not have that duty, it is erroneous and was correctly refused.

▮ Finally, the railroad states that Baker's affirmative defense of assumption of the risk should not have been presented to the jury, first, because Baker did not amend its pleadings to include that defense until trial, and second, because the defense was not supported by the evidence. We need not discuss the timeliness of Baker's amendment, but, as we have indicated earlier, the evidence at trial reveals a credibility issue concerning the state of the railroad's knowledge of the properties of the B—10. Thus, assuming that the digger-derrick is unreasonably dangerous, that evidence presents a jury question of whether the railroad assumed the risks associated with that product. Baker's affirmative defense was properly submitted to the jury.

98

In conclusion, the trial court's order which denied the railroad full opportunity to investigate the statement given to claim agent Woods prejudiced the railroad in the presentation of its defense. For that reason, we must reverse both judgments against the railroad and remand the entire cause to the circuit court of Madison County. Should a new trial occur upon remand, it is to be conducted in accordance with our rulings on the admissibility of evidence and the submission of jury instructions, as set forth in this opinion.

Reversed and remanded.

KASSERMAN and HARRISON, JJ., concur.