Eileen **BAILEY,** Plaintiff-Appellant,

v.

**GRAND TRUNK LINES NEW ENGLAND, Canadian National Railway, Midline Division, St. Lawrence Region,** Defendants-Appellees.

**No. 454, Docket 85–7583.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1985.

Decided Nov. 19, 1986.

John F. Collins, Buffalo, N.Y. (Collins, Collins & DiNardo, Buffalo, N.Y., Lawrence J. Vilardo, Damon & Morey, Buffalo, N.Y., of counsel), for plaintiff-appellant.

Robert B. Hemley, Burlington, Vt. (Dennis R. Pearson, Burlington, Vt., Gravel and Shea, Burlington, Vt., of counsel), for defendant-appellee Canadian Nat. Ry.

Before VAN GRAAFEILAND, NEWMAN and MINER, Circuit Judges.

MINER, Circuit Judge:

Eileen Bailey, administratrix of the estate of Jeffrey Bailey ("Bailey"), appeals from a judgment of the United States District Court for the District of Vermont (Billings, J.) finding in favor of defendant Canadian National Railway ("CNR") in an action brought under the Federal Employers Liability Act ("FELA"), 45 U.S.C. §§ 51–60 (1982). Appellant also challenges an earlier ruling of the district court that, pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611 (1982), and 28 U.S.C. § 1330(a) (1982), struck her demand for a jury trial. *See Bailey v. Grand Trunk Lines New England*, 609 F.Supp. 48 (D.Vt.1984). We affirm Judge Billings' decision with respect to the jury trial issue, but vacate the judgment as to liability and remand for further proceedings.

## I. BACKGROUND

On June 3, 1983, Bailey was operating a CNR railroad track brush cutter on a section of New Hampshire railroad track while his partner, Ronald Riendeau, drove in his truck on a highway that ran parallel to the track. Although a CNR regulation required that all operations involving track machines proceed with at least two men

"working together," the employees' practice was to have one man operate the machine on the track while his partner traveled on the highway to "flag" him at the crossings. This system was employed despite the fact that portions of the track were not always visible from the highway.[1]

The June 3rd work assignment called for Bailey and Riendeau to cover approximately fifty miles of track, from Berlin, New Hampshire to Island Pond, Vermont. By the time Riendeau arrived at the first crossing in West Milan, New Hampshire, he noticed that Bailey already had been flagged across the intersection. Riendeau thus drove to the second crossing in Stark, New Hampshire, where he waited a short time for Bailey to arrive. Believing that Bailey again had preceded him, Riendeau drove ahead to the third crossing in Groveton, New Hampshire. From Groveton, Riendeau returned along the highway to West Milan to look for Bailey. Since he could not see Bailey from the highway, he continued on to Island Pond. Arriving there at approximately 10:30 A.M., Riendeau attempted several times to contact Bailey by radio. Bailey, however, had derailed at approximately 9:30 A.M., and therefore was unable to respond. It is significant to note that although Bailey's derailment occurred at a point where the track was not visible from the highway, there existed alongside that portion of the route a smaller road from which Riendeau's vision of the track would not have been obscured.

The evidence at trial established that railroad employees commenced a search for Bailey somewhere between 12:15 and 12:30 P.M., nearly three hours after the accident. A search party that had proceeded along the small road adjacent to the track discovered Bailey between the first and second crossings at approximately 12:45 P.M. It was not until 2:00 P.M., however, that the rescuers were able to extricate Bailey and

---

1. Customarily, the employees maintained radio contact in order to know of each other's location. Even this contact, though, was sporadic, since there were "dead spots" along the highway from which radio communication was impossible. Both Bailey and Reindeau were able, however, to call a CNR operator who could then relay information between them.

transport him to the hospital. The "crush injury" that Bailey sustained during the approximately four and one-half hours he was pinned underneath the brush cutter resulted in his death four days later.

Eileen Bailey commenced suit against CNR under the FELA, claiming that the railroad was liable to Bailey's estate for negligently causing his death.[2] Although a jury trial was requested, CNR moved to strike the jury demand, arguing that the FSIA precluded a trial by jury against an instrumentality of a foreign state. *See* 28 U.S.C. §§ 1330, 1603. Judge Billings granted CNR's motion, 609 F.Supp. at 52, and the case then was tried to the court. In an unreported decision dated June 28, 1985, Judge Billings rejected each of appellant's claims and found that CNR had not been negligent.

For the reasons set forth below, we affirm the district court's order denying appellant a jury trial, vacate the court's finding that CNR was not negligent, and remand for further proceedings.

## II. DISCUSSION

### A. *Jury Trial*

In striking plaintiff's demand for a jury, the district court properly determined that the FSIA provides the exclusive source of federal jurisdiction in actions against foreign sovereigns or their instrumentalities. *See* 28 U.S.C. §§ 1330(a), 1602–1611; *Ruggiero v. Compania Peruana de Vapores*, 639 F.2d 872 (2d Cir.1981). Since that statutory scheme expressly forecloses the right to a jury trial, we need only determine whether Judge Billings correctly found CNR to be an instrumentality of Canada.

The FSIA defines an "agency or instrumentality of a foreign state" as any entity

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). Appellant concedes that CNR satisfies the first and second elements of section 1603(b), but maintains that CNR is a citizen of a state of the United States, and therefore not an instrumentality of Canada, *see* 28 U.S.C. § 1603(b)(3). We disagree.

 The citizenship of CNR must be determined in accordance with 28 U.S.C. § 1332(c), which provides that "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business...." It is undisputed that CNR is a Canadian corporation. Although it is undisputed also that CNR maintains its *worldwide* principal place of business in Canada, appellant urges that we look instead to CNR's principal place of business *within* the United States. We decline to do so. Such an approach ignores the plain meaning of the concept of a *principal* place of business and is at odds with the overwhelming consensus of authority that a corporation may have only one principal place of business. *E.g., United States Fidelity & Guaranty Co. v. DiMassa*, 561 F.Supp. 348, 351 n. 8 (E.D.Pa.1983), *aff'd mem.*, 734 F.2d 3 (3d Cir.1984); *Woodbridge Plastics, Inc. v. Borden, Inc.*, 473 F.Supp. 218, 223 (S.D.N.Y.), *aff'd mem.*, 614 F.2d 1293 (2d Cir.1979); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3624, at 611 (1984); 1 J. Moore, *Moore's Federal Practice* ¶ 0.77[3.–1], at 717.60 (1986). Those courts considering this question consistently have held

---

**2.** Appellant contends that her husband was an employee of Grand Trunk Lines New England ("GTL"), alleged to be a wholly-owned United States subsidiary of defendant CNR. CNR, however, which is incorporated in Canada, maintains that it employed Bailey. We need not resolve this particular dispute, since CNR was the only defendant ever to enter an appearance in this action. Indeed, appellant did not object to GTL's absence and did not seek a default judgment against any other party named in the complaint.

that an alien corporation's *worldwide* principal place of business, and not its principal place of business within the United States, is controlling. *E.g., Arab International Bank & Trust Co. v. National Westminster Bank Ltd.,* 463 F.Supp. 1145, 1147 (S.D.N.Y.1979); *Eisenberg v. Commercial Union Assurance Co.,* 189 F.Supp. 500, 502 (S.D.N.Y.1960); *see, e.g., Salomon Englander y CIA, Ltda v. Israel Discount Bank, Ltd.,* 494 F.Supp. 914, 916–18 (S.D. N.Y.1980).

Since CNR is a Canadian corporation with its principal place of business in Canada, it is not a citizen of a state of the United States and therefore is entitled to the protections afforded by the FSIA.

Having concluded that application of the FSIA required this action to be tried to the court, we need address only briefly appellant's remaining jury trial claims. First, we reject appellant's contention that the FELA entitled her to a trial by jury. The law is clear that in actions brought against foreign states, the FSIA displaces certain rights which otherwise inhere in a plaintiff's statutory or common law cause of action.[3] More specifically, we expressly have held that the FSIA strips a plaintiff of an otherwise valid entitlement to a jury trial. *Ruggiero,* 639 F.2d at 875–78. Other circuits uniformly have reached the same conclusion. *Arango v. Guzman Travel Advisors,* 761 F.2d 1527, 1532–33 (11th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 408, 88 L.Ed.2d 359 (1985); *Goar v. Compania Peruana de Vapores,* 688 F.2d 417, 423 (5th Cir.1982); *Rex v. Cia. Peruana de Vapores, S.A.,* 660 F.2d 61, 63–64 (3d Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982); *Williams v. Shipping Corp. of India,* 653 F.2d 875, 880–81 (4th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71

L.Ed.2d 691 (1982); *see McKeel v. Islamic Republic of Iran,* 722 F.2d 582 (9th Cir. 1983), *cert. denied,* 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984).

■ Second, we disagree with appellant's claim that CNR has waived its right to a nonjury trial pursuant to 28 U.S.C. § 1605(a)(1) ("A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case ... in which the foreign state has waived its immunity either explicitly or by implication...."). Although CNR has waived its immunity from suit in the United States by virtue of its commercial activities, *see* 28 U.S.C. § 1605(a)(2), it remains amenable to suit in our courts only to the extent permitted by, and in accordance with the express terms of, the FSIA.

■ Finally, there is no merit to appellant's contention that the FSIA's prohibition of jury trials offends her rights under the seventh amendment. Since suits against foreign sovereigns were not permitted at common law, no right to a jury trial in such cases may be found to have attached. *Arango,* 761 F.2d at 1534; *Goar,* 688 F.2d at 424–28; *Rex,* 660 F.2d at 65–69; *Williams,* 653 F.2d at 881–83; *Ruggiero,* 639 F.2d at 878–81.

### B. *CNR's Negligence*

Appellant's complaint alleged that CNR was liable under the FELA because it was negligent in: (1) failing to train Bailey adequately; (2) allowing the brush cutter to fall into a hazardous condition; (3) failing to maintain the track properly; (4) failing to follow its own safety rule; and (5) failing to take reasonable search and rescue steps. After trial, the district court rejected each claim and rendered a verdict in favor of CNR.

---

**3.** We note that, contrary to appellant's contention, the FELA does *not* expressly provide a right to a jury trial. Indeed, the Supreme Court's decision in *Bailey v. Central Vermont Railway,* 319 U.S. 350, 354, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444 (1943), indicated that the right to a jury trial in an FELA action is only implied, not expressly mandated. *See* 5 J. Moore,

*Moore's Federal Practice* ¶ 38.12[6], at 38–125 (1985) (the right to a jury trial in an FELA action is inferred "more obliquely than directly"). We therefore are not confronted with a case in which the limitations of the FSIA are in direct conflict with rights expressly conferred by another federal statute.

In reviewing the district court's determination that CNR was not negligent, we are guided by an extremely narrow standard: we may set aside its factual findings only if clearly erroneous. Fed.R.Civ.P. 52(a); *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

Under the FELA, a railroad engaged in interstate commerce is liable to any employee who, during the course of his employment with the railroad, suffers "an injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees" of the railroad. 45 U.S.C. § 51; *see Rogers v. Missouri Pacific Railroad*, 352 U.S. 500, 507, 77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957); *Miller v. Erie Lackawanna Railway*, 645 F.2d 140, 144 (2d Cir.1981). In order to recover, "the plaintiff must prove that the railroad, with the exercise of due care, could have reasonably foreseen that a particular condition could cause injury. The defendant's duty is measured by what a reasonably prudent person should or could have reasonably anticipated as occurring under like circumstances." *Davis v. Burlington Northern, Inc.*, 541 F.2d 182, 185 (8th Cir.) (citations omitted), *cert. denied*, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976).

 We find no error in Judge Billings' conclusion that CNR was not negligent in instructing Bailey on the operation of the brush cutter. The evidence at trial established that during the course of his employment, Bailey had received extensive, hands-on training from a CNR supervisor. Indeed, Reindeau testified that he and Bailey knew "every bolt" of the machine, and that together they had operated the brush cutter approximately twenty-six times without incident. In light of these facts, it can hardly be said that CNR breached its duty to provide Bailey with proper training.

With respect to the remaining theories of negligence,[4] however, we are unable to agree with Judge Billings' legal analysis and therefore vacate the judgment and remand for further proceedings.

Our concern is with the district court's treatment of appellant's last two claims of negligence, *viz.*, that CNR failed to follow its own safety rule and that it failed to undertake adequate search and rescue efforts. Judge Billings correctly noted that a "railroad has a duty to establish safety rules for the guidance and protection of its employees and, once promulgated, the employee is generally entitled to rely on these safety rules as the appropriate standard of conduct." Slip op. at 16 (citing *Ybarra v. Burlington Northern, Inc.*, 689 F.2d 147 (8th Cir.1982)). He went on to conclude, however, that where those rules "have been nullified by custom and practice, an employee is not justified in relying on them." Slip op. at 16 (citing *Wilson v. Norfolk & Western Railway*, 109 Ill. App.3d 79, 64 Ill.Dec. 686, 696, 440 N.E.2d 238, 248 (1982)).

The safety rule at issue here required that whenever maintenance equipment was being used, "two employees ... must accompany the [track] unit." Defendant's Pretrial Memorandum and Contentions of Fact and Law at 17. Although appellant failed to establish at trial the precise language of the rule, the parties seem to have accepted Judge Billings' paraphrase—that two men must "work together." In finding that CNR was not negligent with respect to the rule, Judge Billings first reasoned that it was the custom and practice among CNR employees to have one worker operate the equipment on the track while the other traveled along the highway to flag his colleague at various crossings. Judge Billings then *assumed* that this particular practice violated CNR's rule, but concluded that such a violation was "not probative of negligence because of [CNR's] employees' established pattern of violation." Slip op. at 17.

With respect to the adequacy of search and rescue efforts, Judge Billings found no evidence upon which to conclude that CNR had deviated from a standard of reason-

---

**4.** On appeal, appellant has abandoned her claims regarding the maintenance of the track and the brush cutter. Accordingly, we do not address these theories of liability.

ableness. This finding necessarily was related to the holding that CNR was not negligent in respect of its safety rule; that is, the delay in undertaking rescue efforts was reasonable only because it was found that Bailey and Reindeau were not required to work together. Obviously, if Bailey and Reindeau had been in closer contact, rescue efforts could have been more immediate.

We reject the view that an employer necessarily avoids liability for violation of its own safety rule by establishing that the rule has been nullified by the custom and practice of the employees for whose benefit it was designed. Judge Billings erroneously endorsed this view because he combined two distinct issues: negligence arising from CNR's specific failure to enforce its own safety rule and negligence arising from CNR's more general failure to exercise reasonable care.

██ Judge Billings correctly assessed the former question. An employer's duty to adhere to a company safety rule may cease to exist if the rule has been effectively repealed by non-enforcement over a substantial period of time. In these circumstances, employees are not justified in relying on the rule, and the failure to observe it does not itself constitute negligence on the part of the employer, *Wilson v. Norfolk & Western Railway*, 109 Ill.App.3d 79, 64 Ill.Dec. 686, 696, 440 N.E.2d 238, 248 (1982), or contributory negligence on the part of the employee, *Hudson v. Seaboard Air Line Railway*, 176 N.C. 488, 97 S.E. 388 (1923); *Louisville & Northern Railroad v. Payne's Adm'r*, 117 Ky. 462, 197 S.W. 928 (1917).

██ What Judge Billings did not recognize, however, is that the conduct required by a safety rule that has been repealed, formally or by prolonged non-enforcement, may still be an ingredient of the general standard of reasonable care that the employer always owes to its employees. Though an abrogated safety rule would not itself constitute the legal standard of care, it may provide evidence of what procedures may or may not be feasible or of practical value. *See Ybarra*, 689 F.2d at 150 (jury entitled to consider whether railroad's customary failure to enforce safety rule constituted negligence). An employer may be liable for its employees' injuries even in, and perhaps because of, the absence of a safety rule.

If Judge Billings finds that CNR was negligent, he must then determine whether its negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers*, 352 U.S. at 506, 77 S.Ct. at 448. Also to be determined is whether Bailey was contributorily negligent, and if so, to what extent any ultimate recovery should be reduced. *See* 45 U.S.C. § 53 (1982); *Meyers v. Union Pacific Railroad*, 738 F.2d 328, 330 (8th Cir.1984).

### III. CONCLUSION

For the reasons set forth above, the order striking appellant's demand for a jury trial is affirmed. The judgment entered in favor of CNR is vacated and the matter is remanded for further proceedings consistent with this opinion.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues that this case must be returned to the district court. In view of the greatly expanded concept of negligence under the Federal Employers Liability Act, 45 U.S.C. §§ 51–60, I find it difficult to understand how Mrs. Bailey could be denied all recovery, even for the three hours of pain and suffering her husband endured while lying under the overturned brush cutter calling vainly for help. *See Dellaripa v. New York, N.H. & H. R.R.*, 257 F.2d 733, 734 (2d Cir.1958). However, I respectfully disagree with the majority's denial of Mrs. Bailey's right to a jury trial, a right which the FELA guarantees the widow of every employee of a common carrier by railroad in the United States who is fatally injured while working in interstate commerce.

Because every Congress correctly has believed that a uniform regulatory scheme

is needed for the operation of a national rail system, railroads in this Country have been subject to comprehensive federal regulation for almost a century. *United Transp. Union v. Long Island R.R.*, 455 U.S. 678, 687–88, 102 S.Ct. 1349, 1355–56, 71 L.Ed.2d 547 (1982). The need for such uniformity requires that all interstate railroads, regardless of their ownership, be subject to the same regulatory provisions. *See California v. Taylor*, 353 U.S. 553, 562, 77 S.Ct. 1037, 1042, 1 L.Ed.2d 1034 (1957); *United States v. California*, 297 U.S. 175, 188, 56 S.Ct. 421, 426, 80 L.Ed. 567 (1936).

With this end in mind, Congress made the century-old Interstate Commerce Act applicable to all carriers engaged in transportation to or from a foreign country "insofar as such transportation takes place within the United States." 49 U.S.C. § 1(1)(c), now in substance 49 U.S.C. § 10501(a)(2); 1 Roberts, *Federal Liabilities of Carriers* § 138 at 387 (2d ed. 1929). "Such transportation must be regulated by this country if it is to be effectively regulated." *United States v. Pennsylvania R.R.*, 323 U.S. 612, 622, 65 S.Ct. 471, 476, 89 L.Ed. 499 (1945).

Insofar as Canadian National's activities in the United States are concerned, it always has been within the scope of this statute. For example, a cursory scan of Interstate Commerce Commission reports for the decade between 1930 and 1940 discloses at least ten cases in which Canadian National was a party to Commission proceedings.[1] See also *H.K. Porter Co. v. Central Vermont Ry.*, 366 U.S. 272, 81 S.Ct. 1341, 6 L.Ed.2d 284 (1961), in which the Supreme Court upheld the jurisdiction of the Commission to regulate transportation practices of Canadian National within the United States.

Of course, the Commission's orders would have little effect if they could not be enforced. Accordingly, long before the State Department's 1952 "Tate Letter", 26 Dep't State Bull. 984, differentiating between sovereign acts and commercial activities of foreign governments, Congress provided for such enforcement through actions against all railroad interstate commerce carriers in the district courts. *See, e.g.*, 49 U.S.C. §§ 9, 16(2)(9)(10)(12). These sections have been repealed, revised and recodified in chapter 117 of Title 49, which was enacted long after the Foreign Sovereign Immunities Act went into effect. Every carrier subject to chapter 1 of the Interstate Commerce Act is required to designate an agent in the District of Columbia upon whom service of notices and processes may be made. 49 U.S.C. § 50, now in substance 49 U.S.C. §§ 10329 and 10330. Section 11705(b)(2) provides that a common carrier providing transportation subject to the jurisdiction of the Commission "is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this subtitle;" *i.e.*, a Commission-related violation. Section 11705(d)(2) provides that all carriers that are parties to a Commission order awarding damages may be joined as defendants in a civil action brought in a district court of the United States and that a judgment ordering recovery may be made against the defendant found to be liable to the plaintiff. *See Genstar Chemical Ltd. v. ICC*, 665 F.2d 1304 (D.C.Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982), in which judgment was awarded

---

1. *Restigouche Co. v. Canadian National Ry.*, 238 ICC 528 (No. 28385, May 16, 1940); *Alms & Doepke Co. v. Canadian National Ry.*, 237 ICC 117 (No. 28171, January 10, 1940); *California Fruit Exchange v. Canadian National Ry.*, 222 ICC 31 (No. 27501, April 15, 1937); *O. & W. Thum Co. v. Canadian National Ry.*, 215 ICC 341 (No. 27095, April 16, 1936); *Pooling Passenger-Train Revenues And Service-Matter Application of Canadian National Ry., et al.*, 201 ICC 699 (No. 26531, June 25, 1934); *Twomey-Williams Co. v. Canadian National Rys.*, 195 ICC 177 (No. 25360, July 5, 1933); *Nichols & Cox Lumber Co. v. Canadian National Rys.*, 191 ICC 503 (No. 25098, February 25, 1933); *Pet Milk Co. v. Canadian National Ry.*, 178 ICC 468 (No. 24170, September 14, 1931); *Amsden v. Canadian National Rys.*, 176 ICC 259 (No. 22611, May 26, 1931); *Iroquois Pulp & Paper Co. v. Canadian National Rys.*, 169 ICC 226 (No. 21902, November 14, 1930).

against Canadian National and other railroads for overcharges.

Finally, the Act provides for both civil and criminal penalties imposed upon both carriers and employees, *see, e.g.,* 49 U.S.C. §§ 1(7)(12)(20)(21) and 41, now in substance chapter 119 of Title 49, and provision is made for trial in the district courts. *See* sections 11901(*l*)(1); 11903(d); 11904(c)(3).

Of course, the ICC is not directly involved in the instant case. The foregoing discussion is simply illustrative of the unwavering congressional intent that all railroad common carriers in the United States be regulated in like manner. Every regulatory enactment by Congress has been applied broadly and uniformly. For example, every common carrier engaged in interstate commerce by railroad is subject to the provisions of the Safety Appliance and Boiler Inspection Acts, and penalties for violation of these Acts may be recovered in suits brought by United States attorneys in district courts. 45 U.S.C. §§ 6, 13, 34. *See California v. Taylor, supra,* 353 U.S. at 562, 77 S.Ct. at 1042. The Ash Pan Act of 1908, 45 U.S.C. §§ 17–21, since repealed, made it unlawful for "any common carrier engaged in interstate or foreign commerce by railroad" to use a locomotive not equipped with a proper ash pan. *Id.* § 17. Any carrier violating the statute was made subject to a penalty to be recovered by the United States attorney "in the district court of the United States having jurisdiction in the locality where such violation shall have been committed." *Id.* § 18. The Railroad Hours of Service Law, 45 U.S.C. §§ 61–64b, enacted in 1907, applied to interstate carriers and carriers operating "from any place in the United States to an adjacent foreign country." *Id.* § 61(a). As amended in 1976, it applies to "any common carrier engaged in interstate or foreign commerce by railroad." Violations of the Act subject carriers to a penalty of $500 "to be recovered in an action to be brought by the United States attorney in the district court of the United States for the judicial district in which such violation occurred or in which the defendant has its principal executive office." *Id.* § 64a(a).

The Accident Reports Act of 1910 requires that every common carrier engaged in interstate commerce by rail file monthly reports of accidents with the Secretary of Transportation and makes the carrier guilty of a misdemeanor if it fails to do so. 45 U.S.C. §§ 38, 39. See also the Railway Labor Act, 45 U.S.C. §§ 151–163, which applies to "any ... carrier by railroad, subject to the Interstate Commerce Act," *id.* § 151 First; *United Transp. Union v. Long Island R.R.,* 455 U.S. 678, 688, 102 S.Ct. 1349, 1355, 71 L.Ed.2d 547 (1982), and provides for penalties collectible through actions by United States attorneys, *id.* § 152 Tenth.

Finally, in 1970, Congress enacted the Railroad Safety Act, 45 U.S.C. §§ 421–441, which empowers the Secretary of Transportation to prescribe rules, standards, etc. "for all areas of railroad safety." *Id.* § 431(a). Congress declared its intent that "laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable." *Id.* § 434. A review of the legislative history accompanying this Act and its amendments makes only too clear the need for comprehensive and uniform regulation of all railroads. *See* 1970 U.S.Code Cong. & Ad.News 4104–4132; 1976 U.S.Code Cong. & Ad.News 1534–1554; 1978 U.S. Code Cong. & Ad.News 5499–5517. Information contained in these congressional reports shows, for example, that, between 1966 and 1974 "train-caused train accidents per ton mile increased by more than 100 percent." *Id.* at 5514. Apropos of the instant suit which involves a derailment, the 1978 report discloses that "track is not only the largest but also the most rapidly increasing contributing cause of train accidents." *Id.* at 5502. It is not surprising, therefore, that Congress intended the term "railroad" to include all railroads and not be "limited to the confines of 'common carrier by railroad' as that language is defined in the Interstate Commerce Act." 1970 U.S.Code, *supra,* at 4114. The Railroad Safety Act makes it unlawful for "any railroad" to disobey the rules, standards,

etc. prescribed by the Secretary of Transportation, 45 U.S.C. § 438, and provides for enforcement in actions brought in the United States district courts. *Id.* § 439. The Act also provides that the rules, standards, etc. promulgated thereunder shall have "the same force and effect as a statute" in actions brought under the Employers Liability Act. *Id.* § 437(c).

With the foregoing as a background, we turn now to the provisions of the FELA, the statute involved in the instant case. This statute, enacted in 1908, makes "[e]very common carrier by railroad while engaging in commerce between any of the several States ... or any of the States ... and any foreign nation ... liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part ... [from the carrier's negligence]." 45 U.S.C. § 51. It provides further that any employee of a carrier employed in such commerce "shall be considered as entitled to the benefits of [the Act]." This statute was intended to be "all-inclusive" and to apply alike to public and privately owned railroads. *California v. Taylor, supra,* 353 U.S. at 563–64, 77 S.Ct. at 1043–44. It is an Act regulating commerce within the meaning of 28 U.S.C. § 1337, so as to give federal courts jurisdiction to enforce its provisions. *Imm v. Union R.R.,* 289 F.2d 858 (3d Cir.), *cert. denied,* 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 35 (1961); *see Fox v. Consolidated Rail Corp.,* 739 F.2d 929, 932–33 (3d Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 962, 83 L.Ed.2d 968 (1985); *Finnerty v. Cowen,* 508 F.2d 979, 983–84 (2d Cir.1974).

During the early years of the FELA's existence, the tendency of lower courts was to treat section 51 as if it simply incorporated the concepts of common law negligence. However, the Supreme Court unequivocally held that those courts were misinterpreting the statute. In case after case, the Supreme Court rejected decisions of lower courts which either took an FELA case from the jury or set aside a jury verdict. *See Wilkerson v. McCarthy,* 336 U.S. 53, 71–72, 69 S.Ct. 413, 422, 93 L.Ed.

497 (1949) (Douglas, J., concurring). The FELA, said the Court, is "an avowed departure from the rules of the common law." *Sinkler v. Missouri Pacific R.R.,* 356 U.S. 326, 329, 78 S.Ct. 758, 762, 2 L.Ed.2d 799 (1958). It provides injured employees with a "statutory negligence action that [is] significantly different from the ordinary common-law negligence action." *Rogers v. Missouri Pacific R.R.,* 352 U.S. 500, 509–10, 77 S.Ct. 443, 450, 1 L.Ed.2d 493 (1957). *See also Shepard v. New York, N.H. & H. R.R.,* 300 F.2d 129, 130 (2d Cir.1962).

Most importantly for purposes of the instant case, the Supreme Court, and this Court as well, have held consistently that the jury trial "is part and parcel of the remedy afforded railroad workers under the Employers Liability Act." *Schulz v. Pennsylvania R.R.,* 350 U.S. 523, 524, 76 S.Ct. 608, 609, 100 L.Ed. 668 (1956); *Bailey v. Central Vermont Ry.,* 319 U.S. 350, 354, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444 (1943); *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 360, 82 S.Ct. 780, 784, 7 L.Ed.2d 798 (1962); *Johannessen v. Gulf Trading & Transp. Co.,* 633 F.2d 653, 656 (2d Cir.1980). "Congress intended the Act to be remedial legislation ... and under it 'trial by jury is part of the remedy.'" *Eggert v. Norfolk & W. Ry.,* 538 F.2d 509, 511 (2d Cir.1976) (*quoting Ellerman, supra,* 369 U.S. at 360, 82 S.Ct. at 784).

"This wider availability of jury determinations in FELA cases is consistent with Congress' desire 'to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations.'" *Mendoza v. Southern Pacific Transp. Co.,* 733 F.2d 631, 633 (9th Cir.1984) (*quoting Wilkerson v. McCarthy, supra,* 336 U.S. at 68, 69 S.Ct. at 420). Unlike my colleagues, I do not believe that Congress intended to relieve Canadian National Railway of this cost in the case of Jeffrey Bailey.

Canadian National is a common carrier in both the United States and Canada. *Canadian National Ry. v. United States, su-*

*pra,* 425 F.Supp. at 292. The limited facilities available for my review of Canadian law satisfy me that a plaintiff suing Canadian National in its own country would be entitled as of right to a jury trial. Section 44(3) of the Canadian National Railways Act, 1955 Can.Stat. 133, 147, provides:

> Any court having under the statutes or laws relating thereto jurisdiction to deal with any cause of action, suit or other proceeding, when arising between private parties shall, with respect to any similar cause of action, suit or other proceeding by or against the National Company, be a court of competent jurisdiction under the provisions of this section.

In *Carpenter v. Canadian National Ry.,* [1955] 3 D.L.R. 492, Chief Judge Walsh, writing for the Newfoundland Supreme Court, cited three Canadian cases which, he said, held "that a person taking action against the C.N.R. for damages resulting from the negligence of a servant of the Company is entitled to have trial by jury." *Id.* at 494. He concluded:

> I consider that the *Canadian National Railways Act* creates the Company as a legal entity separate and distinct from the Crown, and not as an agent of Her Majesty, for the operation and management of all railways controlled by, entrusted to, or constructed by, the Company, and authorizes actions by and against the Company in Courts of competent jurisdiction, as one of the powers incidental to its corporate capacity. In respect of the operation of railways vested in the Crown, the Act makes available to the Company any defence to an action that would be available to Her Majesty, if she were a party to the action. I consider, therefore, that the defendant is not an agency of the Crown within the meaning of s.23 of the *Crown Liability Act.*

*Id.* at 496. *See also Michaud v. Canadian National Ry.,* [1924] 3 D.L.R. 1.

In 1970, Canadian National formed a wholly-owned subsidiary, Grand Trunk Corporation, under the laws of Delaware, for the purpose of consolidating Canadian National's extensive interests in the United States railroad industry. Grand Trunk acquired Central Vermont Railway in 1971 and is its sole shareholder.[2] Although there is some indication in the record that Jeffrey Bailey was paid by Central Vermont Railway, Canadian National "concedes" that Bailey was employed by it. On the basis of this concession, Canadian National argues that Bailey's widow must be deprived of "part and parcel of the remedy" afforded by the FELA to all other railroad workers in the United States and their widows. This, I believe, would surprise those members of Congress who are familiar with the salutary purposes underlying the enactment of the FELA. *See Parden v. Terminal R.R.,* 377 U.S. 184, 197, 84 S.Ct. 1207, 1215, 12 L.Ed.2d 233 (1964).

Canadian National admits, as it must, that "it is subject to all U.S. rules and regulations for its U.S. rail operations." Appellees' Brief at 13. These rules and regulations, as contained in the Interstate Commerce Act, the Safety Appliance Act, the Boiler Inspection Act, the Hours of Labor Law, the Railroad Safety Act, and the FELA, were designed to regulate the activities of all railroad common carriers in the United States and to protect and benefit their employees. I suggest that, if Congress had intended to take from those employees the remedy of a jury trial, it would have said so specifically. "Sovereign immunity is a derogation from the normal exercise of jurisdiction by the courts and should be accorded only in clear cases."

---

**2.** Appellant's trial counsel erroneously told the district court that "The Canadian National Railroad or the Grand Trunk Line was originally a St. Lawrence Railroad that was bought by the Grand Trunk Lines who was later bought by Canadian National." App. 119. In this court, counsel takes the position that the "Grand Trunk Lines New England" named in the com-

plaint is the same company as Grand Trunk Corporation, the Delaware holding company. In any event, the district court "assume[d] that, as a wholly-owned subsidiary of Canadian National, Grand Trunk Lines falls under the auspices of Canadian National for litigation purposes."

*Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir.1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965).

Canadian National is no stranger to jury trials in United States courts. *See, e.g., Taylor v. Canadian National Ry.*, 301 F.2d 1 (2d Cir.), *cert. denied*, 370 U.S. 938, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962); *Canadian National Ry. v. Conley*, 226 F.2d 451 (1st Cir.1955); *Jock v. Canadian National Ry.*, 552 F.Supp. 458 (N.D.N.Y.1982); *Bonney v. Canadian National Ry.*, 100 F.R.D. 388 (D.Me.1983); *Supples v. Canadian National Ry.*, 53 A.D.2d 1017, 386 N.Y. S.2d 489 (1976) (*mem.*). All of these cases proceeded just as if they were being brought in Canada itself—no one contended that the plaintiffs were suing the Canadian government. I suggest that Mrs. Bailey is not suing the Canadian government in the instant case. She is suing a United States common carrier, seeking relief that is "part and parcel" of the remedy that Congress has made available to widows of common carrier employees under the FELA.[3]

---

**3.** Because Canadian National, directly or through wholly-owned subsidiaries, has well over 4000 employees in the United States, our decision in this case should be a matter of some concern to those employees and the Brotherhoods that represent them.