**PETROLEUM & ENERGY INTELLIGENCE WEEKLY, INC. and Wanda Jablonski, Plaintiffs,**

v.

**William LISCOM, Energy Information Investments, Ltd. and Barry Jolly, Defendants.**

**No. 88 Civ. 3840(JMW).**

United States District Court, S.D. New York.

Sept. 27, 1989.

W. Bruce Johnson, Battle & Fowler, New York City, for plaintiffs.

Vito J. Cassan, Mishkin, O'Neil & McAllister, New York City, for defendants.

## MEMORANDUM AND ORDER

WALKER, District Judge:

Defendants William Liscom ("Liscom"), Energy Information Investments, LTD. ("EII") and Barry Jolly ("Jolly") move for an order dismissing plaintiffs' amended complaint for want of subject matter jurisdiction, alleging that there is no diversity of citizenship between plaintiffs and EII. Defendants also request that this Court impose sanctions pursuant to Fed.R.Civ.P. 11. Plaintiffs Petroleum & Energy Intelligence Weekly, Inc. ("PIW") and Wanda Jablonski ("Jablonski") contend that diversity exists and, in the alternative, request that they be permitted to move to amend their complaint by deleting EII from the caption. For the reasons stated below, the Court finds that complete diversity does not exist. However, plaintiffs' request for leave to move to voluntarily dismiss EII from this case is granted.

### I. Background

PIW, a New York corporation with its principal place of business in New York, New York, is primarily engaged in publishing two oil and gas industry newsletters: *Petroleum Intelligence Weekly* ("PIW") and *Petroleum Market Intelligence* ("PMI"). Jablonski is a resident of New York and is the founder, editor and publisher of PIW. Defendant Liscom, a New Jersey resident, was employed by PIW as its business manager from March 1987 until May 31, 1988.

On March 29, 1988, Liscom announced his resignation effective May 31, 1988. According to PIW, "Liscom agreed that in his remaining months as an employee he would train a new consultant to take over from Liscom the task of overseeing PIW's computer operations, including the subscription service relating to its two publications." Am.Complaint ¶ 10.[1]

The next day, March 30, 1988, International Thomson Organization Ltd. ("Thomson") offered to buy PIW for the sum of $15 million in cash. By April 29, 1988 PIW and Thomson purportedly had worked out the final details of the purchase. Plaintiffs allege that "defendants thereafter, in concert with and directing several other employees, caused Thomson to withdraw its offer." Am.Complaint ¶ 12. Plaintiffs further allege that after Thomson withdrew its offer, "Liscom, while still employed by PIW and while Jablonski was actively soliciting additional offers to buy PIW, set upon a scheme, in concert with defendant Jolly [a resident of the Cayman Islands] and ... with others, to effect the simultaneous resignation of all PIW's staff members and to form a new company to engage in direct competition with PIW." Am.Complaint ¶ 13.

It is undisputed that at this time Liscom and Jolly did in fact form defendant EII, a Cayman Islands Corporation. Plaintiffs further allege that Liscom, while still employed by PIW and using PIW's facilities, over several weeks in May obtained employment agreements, effective June 1, 1988, between most of PIW's employees and EII.

According to plaintiffs, on or about May 15, 1988, the Petroleum Finance Company ("PFC") offered to buy PIW for a sum of $15 million in cash and arranged to meet with PIW's key editorial staff on May 31. Before the arranged meeting date, on May 29, defendant Jolly called Jablonski at her home and the following exchange allegedly occurred:

> Jolly told Jablonski that he was aware that she was in the process of attempting to sell PIW. He also told her that he was speaking as the representative of all PIW's employees, and that he had in hand fully executed employment agreements, effective June 1, between all of her employees and EII. He stated that these agreements were for sale for approximately $4 million, and that if she refused to purchase these agreements, PIW's employees were going to walk out and join EII. Jablonski refused.

Am.Complaint ¶ 17.

PFC's managing director met with PIW's editorial staff on May 31 as planned. La-

---

1. In order to briefly set forth plaintiff's underlying allegations and to provide background information, this Court looks to plaintiffs' amended complaint. Several of plaintiffs' allegations, of course, are hotly contested.

ter that day, all but one of the nine PIW employees at the New York headquarters and all but one of the five overseas employees resigned. The next day, June 1, they began to work for EII, in offices leased in New York as of June 1. After being advised of the walkout, PFC withdrew its $15 million cash offer.[2]

On June 3, 1988, PIW commenced this litigation against defendants, alleging that: (1) Liscom individually and in conspiracy with the other defendants breached his fiduciary duties owed to plaintiff; (2) EII's and Jolly's actions constituted tortious interference with PIW's relationships with its employees; (3) EII is intended to create and will cause a likelihood of confusion in the minds of the public and therefore constitutes unfair competition, and EII has been unjustly enriched at PIW's expense. On February 7, 1989, PIW filed an amended complaint, adding Jablonski as a plaintiff, rewording and reordering the facts, and substantially rewriting and developing the causes of action. Specifically, the amended complaint adds a new claim—loss of market value of PIW because of the actions of all defendants—and specifies additional causes of action against defendant Liscom including breach of contract and tortious injury to PIW's business operations. Defendants now move to dismiss this second complaint for want of subject matter jurisdiction.

## II. *Discussion*

28 U.S.C. § 1332(a) provides that the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000,[3] exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States and in which citizens of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

For purposes of diversity jurisdiction, a corporation is deemed to be "a citizen of any State by which it has been incorporated and of a State where it has its principal place of business." 28 U.S.C. § 1332(c). At the outset, this Court must determine whether § 1332(c) applies to foreign corporations. If it does not apply, then EII's citizenship would be determined solely by its incorporation in the Cayman Islands, and diversity would exist. If, on the other hand, § 1332(c) *does* apply to foreign corporations, then this Court must determine whether EII's principal place of business at all relevant times was in New York. If so, EII would be a citizen of New York for diversity purposes and jurisdiction would not exist. *See Strawbridge v. Curtiss*, 7 U.S. 287, 2 L.Ed. 435 (1806) (complete diversity necessary).

### A. *The Scope of § 1332(c)*

Before 1958, a corporation was deemed a citizen of its state of incorporation only. In 1958, Congress adopted the current language of § 1332(c) to make a corporation a citizen not only of the state in which it was incorporated but also of the state of its principal place of business. S.Rep. No. 1830, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code & Admin.News 3099. Since that time, the scope of § 1332(c)'s applicability to foreign corporations has been the subject of much debate and disagreement. The Second Circuit has "suggested that alien corporations are not citizens of the state in which they have their principal place of business." *Corporacion Venezolana de Fomento v. Vintero Sales*, 629 F.2d 786 (1980), *citing Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, n. 5 (2d Cir.1976). However, the courts' observations in these cases were merely dictum. For example, the court in *Venezolana* explicitly noted:

We need not reach the issue of whether or not 28 U.S.C. § 1332(c) applies to alien

---

**2.** In July 1988, PFC proposed to purchase PIW on terms substantially less beneficial than its original offer. On December 1, 1988, PFC purchased PIW at these less attractive terms.

**3.** In 1988, Congress enacted a bill amending 28 U.S.C. § 1332(a) which increased the jurisdictional amount from $10,000 to $50,000.

corporations, however, because it is enough in this case to hold that, even assuming such dual citizenship, the fact that alien parties were present on *both* sides would completely destroy diversity. 629 F.2d at 790, *citing Hercules, Inc. v. Dynamic Export Corp.*, 71 F.R.D. 101 (S.D.N.Y.1976).

The Second Circuit also did not reach the question of whether § 1332(c) applies to foreign corporations in *International Shipping v. Hydra Offshore, Inc.*, 875 F.2d 388 (2d Cir.1989). In that case, Judge Kaufman cited *Venezolana* for the well-established rule that "the presence of aliens on two sides of a case destroys diversity jurisdiction." *Id.* at 391. Judge Kaufman held that Rule 11 sanctions were warranted in that case because there were alien corporations on both sides and plaintiff's attorney failed to discover this jurisdictional defect through a proper pretrial inquiry. His comments about the applicability of § 1332(c) to foreign corporations were dictum.

For their part, plaintiffs rely heavily upon *Bailey v. Grand Trunk Lines New England*, 805 F.2d 1097, 1100–01 (2d Cir. 1986). That case, however, also did not address the question before this Court. Instead, it addressed a separate statute, 28 U.S.C. § 1603(b), which specifically incorporated § 1332(c). In *Schneider v. Bahama Cruise Line, Inc.*, 664 F.Supp. 80 (S.D.N.Y. 1982), Judge Carter of this district found that "*Bailey* implicitly but unambiguously ends the debate in this circuit over § 1332(c)," since the Second Circuit "assumed [§ 1332(c)'s] applicability" to alien corporations. *Id.* at 81–82. This Court's reading of *Bailey* leads it, respectfully, to a different view. Rather than "assuming"

the applicability of § 1332(c), in that case the Second Circuit was *statutorily required* to find it applicable given the express terms of 28 U.S.C. § 1603(b).[4] The *Bailey* court never discussed whether § 1332(c) applied to alien corporations which arguably had their principal place of business in a state in the United States. Thus, *Bailey* merely added to the ever increasing dictum but did not end the debate on § 1332(c)'s applicability.

While the Second Circuit has not squarely faced the issue presented here, this Court has done so. In *Clifford Corporation v. Alfred Ingber*, 713 F.Supp. 575 (S.D.N.Y. 1989), after careful and exhaustive examination of relevant district and circuit court opinions, the Court found that § 1332(c) does apply to foreign corporations. Upon careful review of *Clifford*, all subsequent authorities, and the parties' submissions, the Court reaffirms its earlier analysis.

The Court continues to be persuaded by the reasoning of the Fifth Circuit in *Jerguson v. Blue Dot Investment, Inc.*, 659 F.2d 31 (5th Cir.1981). In that case, the court first observed that neither the statutory language nor the legislative history of § 1332(c) indicated whether the provision applies to foreign corporations. The court then noted that by adopting § 1332(c), Congress intended "to eradicate a perceived abuse engendered by the citizenship incorporation rule," which had allowed a local entity to escape appearing in state court by merely advancing the legal fiction that it was, in fact, a citizen only of the state where it had been incorporated, and not where it conducted business.[5] The court explained why the rationale behind

---

**4.** *Bailey* was not a diversity case, but a case brought by a U.S. citizen against the Canadian National Railroad ("CNR") under the Federal Employers' Liability Act, 45 U.S.C. § 51–60. CNR, a Canadian corporation, sought to strike the plaintiff's jury demand, claiming that it was an "agency or instrument of a foreign state," as defined under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 & 1603(b), and thus could only be subject to a nonjury trial. Under § 1603(b)(3), a corporation will not be deemed an instrumentality of a foreign state if it can also be deemed "a citizen of the

United States as defined in § 1332(c) & (d) of this title." Applying the statute, the court found that CNR with its principal place of business in Canada was not a citizen of any "State of the United States" within the meaning of § 1332(c) and, thus, CNR qualified for sovereign immunity under the federal FSIA, 28 U.S.C. § 1603(b)(3).

**5.** *See also* American Law Institute, *Study of the Division of Jurisdiction Between State and Federal Courts* 101, 105 (1969).

§ 1332(c) compelled a finding that the statute applied with equal force to foreign corporations:

> Congress intended to limit the diversity jurisdiction of the federal courts to those out-of-state citizens who should be free of local bias. Congress decided there was no need for federal court protection of a corporation with its principal place of business in the same state in which its legal adversary is a citizen, even though it is incorporated elsewhere. Applying § 1332(c) to alien corporations effectuates that congressional purpose. There is no reason to treat [a foreign corporation with its principal place of business in the forum state] differently from, for example, a Delaware corporation which has its principal place of business in [the forum state].

*Id.* at 35. The Eleventh Circuit Court of Appeals has noted *Jerguson* with approval. *See Vareka Investments, N.V. v. American Investment Properties, Inc.,* 724 F.2d 907, 909–10 (11th Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984).

Several courts in this district have similarly determined that § 1332(c) applies to foreign corporations. *See, e.g., Schneider v. Bahama Cruise Line, Inc.,* 664 F.Supp. 80 (S.D.N.Y.1987) (Carter, J.); *Rubinfeld v. Bahama Cruise Line, Inc.,* 613 F.Supp. 300 (S.D.N.Y.1985) (Leisure, J.); *Arab International Bank & Trust Co. v. National Westminster Bank Ltd.,* 463 F.Supp. 1145, 1147 n. 1 (Sand, J.) (no holding, but noting that "the commentators suggest that applying the dual citizenship principle of § 1332(c) to foreign corporations is the better rule") (citation omitted). Many courts outside this district have reached the same conclusion. *See, e.g., Southeast Guaranty Trust Co. v. Rodman & Remshaw,* 358 F.Supp. 1001 (N.D.Ill.1973); *Trans World Hospital Supplies Ltd. v. Hospital Corpo-*

*ration of America,* 542 F.Supp. 869 (M.D. Tenn.1982).[6]

■ Thus, for the reasons set forth in *Jerguson,* as adopted and applied by this Court in *Clifford,* the Court concludes that § 1332(c) applies to foreign corporations. Accordingly, the Court must now determine EII's principal place of business.

### B. *EII's Principal Place of Business*

In general, the existence of federal diversity jurisdiction is determined by the citizenship of the parties at the time that action is commenced. *See Dullard v. Berkeley Assoc. Co.,* 606 F.2d 890 (2d Cir. 1979). Defendants contend, however, that the amended complaint does not relate back to the original complaint for diversity purposes because the amended complaint contains new pleadings.[7] Defendants argue that in determining EII's principal place of business this Court should examine the extent of EII's activities in New York at the time the amended complaint was filed. Whether the amended complaint does indeed constitute a new pleading is academic since this Court finds that EII's principal place of business was in New York as early as June 3, 1988.

■ Two tests have evolved in this circuit for determining the location of a corporation's principal place of business. On the one hand, a corporation which has its operations spread across numerous states has its principal place of business at "the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of corporate objective." *R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 655 (2d Cir.1979), *quoting Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862, 865 (S.D.N.Y.1959). On the other hand, a corporation which does

---

**6.** *But see* the four district court cases cited in *Clarkson,* 544 F.2d at 628 n. 5, and *see Salomon Englander y CIA, LTDA v. Isreal Bank, Ltd.,* 494 F.Supp. 914 (S.D.N.Y.1980); *Chemical Transportation Corp. v. Metropolitan Petroleum Corp.,* 246 F.Supp. 563 (S.D.N.Y.1964).

**7.** Fed.R.Civ.P. 15(c) provides:

> Whenever a claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

not have its operations spread across numerous states, but is centralized, has its principal place of business where it "has its most extensive contacts with, or greatest impact on, the general public." *R.G. Barry*, 612 F.2d at 655; *Inland Rubber Corp. v. Triple A Tire Service, Inc.*, 220 F.Supp. 490 (S.D.N.Y.1963).

■ Applying *R.G. Barry*, the Court finds that New York was EII's principal place of business on June 3, 1988. As of that date, EII had obtained a New York lease and its employees had begun to work in New York on EII's new publications.[8] Except for three reporters located in EII's branch office in London, and another in Paris, all officers, employees, staff, and support personnel of EII were located at the New York offices.[9] While defendant suggests that much of the masterminding of the new company occurred in the Cayman Islands, after EII opened its New York office on June 1, 1988 New York was unquestionably the new company's principal place of business.

This case differs considerably from those cited by plaintiffs for the proposition that in some circumstances the principal place of business is the corporation's state of incorporation. In those cases, the corporations either had been incorporated but had not begun any activity, or had wound down and had little or no remaining activity. *See, e.g., Gavin v. Read Corp.*, 356 F.Supp. 483 (E.D.Pa.1973); *Timber Ridge Homeowners Assn v. Allstate Dev. Corp.*, 472 F.Supp. 86 (E.D.Wis.1979). In this case, in contrast, EII had located its staff in New York and had begun considerable activity there by the time the original complaint was filed. That activity anticipated increased future activity.

That EII had not yet paid employees, developed a clear strategy, or published a product as of June 3 is irrelevant. It was a new company. It is not unusual for a new company to need start up time. As of June 3, 1988, EII's start up activities were well underway in its principal place of busi-

ness—New York, New York. Thus, diversity jurisdiction does not exist.

### C. *Request to Voluntarily Dismiss EII*

Plaintiffs have asked that "if the Court concludes both that § 1332(c) does apply to EII and that New York was EII's principal place of business prior to June 3, plaintiffs be permitted to [move to] amend [their complaint] by deleting EII from the caption." P.Reply Mem. at 16. In the interests of justice, the Court will exercise its discretion to allow plaintiffs to move to voluntarily dismiss the complaint as to EII. Within two weeks of this order, plaintiffs shall submit their motion, accompanying affidavit and brief memorandum of law. Defendants shall have two weeks to reply.

Further, because this Court finds that plaintiffs' arguments in opposition were not submitted in bad faith and were not patently frivolous, it denies defendants' request for Rule 11 sanctions.

SO ORDERED.

---

8. For employee testimony, *see* Di Roma Aff.; Baldwin Aff.; Johnston Aff.; Benedict Aff.; Haus Aff.; Strasser Aff.

9. *See* Johnson Aff. ¶¶ 4–6.